UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

VIBRA-TECH ENGINEERS, INC.,

      Plaintiff,

   v.

SCOTT KAVALEK, et al.,

      Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 08-2646
(JEI/AMD)

**OPINION PURSUANT TO FED. R.
CIV. P. 52(a)(1)**

**APPEARANCES:**

EARP COHN
By:  Edward F. Borden, Jr.
20 Brace Road, 4th Floor
Cherry Hill, NJ 08034
    Counsel for Plaintiff Vibra-Tech Engineers, Inc.

LAW OFFICES OF JOHN J. MASTER, JR.
By: John Joseph Master, Jr.
49 Grove Street
Haddonfield, NJ 08033
Newark, NJ 07102
    Counsel for Plaintiff Vibra-Tech Engineers, Inc.

LEONARD, SCIOLLA, HUTCHISON, LEONARD & TINARI, LLP
By:  Hugh J. Hutchison
712 East Main Street, Suite 1A
Moorestown, NJ 08057
    Counsel for Defendant Scott Kavalek

JACKSON LEWIS LLP
By:  Alexander Nemiroff
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
    Counsel for Defendants Roberta Kavalek, Integrated
Geotechnical Solutions, Inc., and Geotech Instruments, Inc.

STARK AND STARK, PC
By:  Andrew John Podolski
P.O. Box 5315
Princeton, NJ 08543
    Counsel for Defendant Charles Bauman

1

**IRENAS**, Senior District Judge:

This case involves claims by Vibra-Tech Engineers, Inc. ("Vibra-Tech") that Defendants Scott and Roberta Kavalek (collectively "the Kavalek Defedants") breached employment agreements, violated the duty of loyalty, converted Vibra-Tech's property, and engaged in a civil conspiracy in order to benefit their own competing corporations, Geotech Instruments, Inc. ("Geotech") and Integrated Geotechnical Solutions, Inc. ("IGS").[1] Vibra-Tech seeks compensatory, punitive and treble damages and attorneys' fees.  A twelve-day bench trial commencing on January 11, 2012 was held.  The Court now issues this Opinion in accordance with Federal Rule of Civil Procedure 52(a)(1).[2]

On June 3, 2010, the attorney for Defendants entered a stipulation which stated, *inter alia*:

> A. Scott Kavalek and Roberta Kavalek, acting on behalf of themselves and on behalf of defendants Integrated Geotechnical Solutions, Inc. ("IGS") and Geotech Instruments, Inc. ("Geotech") (collectively, the "Kavalek

---

[1]  Vibra-Tech is a Delaware corporation with a principal place of business in Pennsylvania.  Defendants IGS and Geotech are New Jersey corporations with principal places of business in New Jersey.  Defendants Scott and Roberta Kavalek are citizens of the state of New Jersey.  This Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

[2]  "In an action tried on the facts without a jury . . . the court must find the facts specifically and state its conclusions of law separately.  The findings may . . . appear in an opinion or memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1).

Defendants"), knowingly and purposefully changed, manipulated, tampered with and withheld evidence that was contrary to the factual and legal contentions they have advanced in this action;

B. In so doing, Scott Kavalek and Roberta Kavalek acted with the intent and purpose to deceive both the court and the other parties to this action; and

C. After performing the acts of tampering, Scott Kavalek and Roberta Kavalek then engaged in a series of acts to conceal and cover up the actions they had taken. These included giving false deposition testimony, filing and supplying false affidavits and declarations under oath, and causing their counsel to make a series of false representations to the court, most of which were made in the Kavaleks' presence.

The Kavaleks' response to legitimate discovery requests mirrored the conduct they displayed while employed by Vibra-Tech and, in the case of Scott Kavalek, while bound by a two-year non-compete agreement.

**TABLE OF CONTENTS**

I. Introduction ............................................. 5

II. Findings of Fact

    A. Vibra-Tech ........................................ 10

    B. IGS ............................................... 12

    C. Scott Kavalek's involvement with IGS ............. 15

    D. Diversion of business from Vibra-Tech to IGS ....... 21

    E. Geotech ........................................... 37

    F. Scott Kavalek's termination ....................... 44

    G. Evidence Tampering ................................ 45

    H. Damages ........................................... 51

        a. IGS-related damages ........................... 51

        b. Geotech-related damages ....................... 55

III. Conclusions of Law

    A. Breach of fiduciary duty ......................... 56

    B. Breach of employment agreements .................. 60

    C. Tortious interference with prospective economic advantage ................................ 62

    D. Tortious interference with existing business relationships ...................................... 64

    E. Tortious interference with the Bauman Employment Agreement ......................................... 65

    F. Conversion ........................................ 66

    G. Civil conspiracy .................................. 67

    H. Unjust enrichment ................................. 68

    I. Common law fraud .................................. 69

    J. New Jersey Consumer Fraud Act ..................... 71

IV. Damages

    A. Theories of recovery ............................. 74

    B. Disgorgement of profits .......................... 78

    C. Treble damages and attorneys' fees ............... 79

    D. Punitive damages .................................. 81

V. Conclusion ............................................. 83

## I. Introduction

Vibra-Tech asserts the following claims against Defendants Scott Kavalek, Roberta Kavalek, Geotech and IGS: (1) breach of fiduciary duties; (2) breach of employment agreements; (3) tortious interference with prospective economic advantage; (4) tortious interference with existing business relationships; (5) conversion of property; (6) civil conspiracy; (7) unjust enrichment; (8) common law fraud; (9) tortious interference with Charles Bauman's employment agreement; and (10) consumer fraud under the New Jersey Consumer Fraud Act.[3]

The following are stipulated facts as stated in the Joint Final Pre-Trial Order.

Vibra-Tech specializes in the measurement of vibrations in construction, quarry, and mining operations, and consults in the areas of liability seismology, blasting, efficiency, structure dynamics and geophysics. (Joint Final Pre-Trial Order, Part II, ¶ 1.) Vibra-Tech also provides methods, instrumentation, and expertise to minimize effects of blasting. (*Id.*) Vibra-Tech maintains an office in New Jersey located at 500 A Campus Drive,

---

[3] On January 12, 2012, after the commencement of trial in this case, Defendant Charles Bauman filed a chapter VII bankruptcy petition. (*See* Trial Transc. 1/12/12 at 3:11-19.) In light of this development, Plaintiff decided not to pursue its claims against Defendant Bauman. (*Id.* at 15:3-5.)("[W]e do not intend to go to the bankruptcy court to seek relief from the stay in order to allow us to proceed in this trial against Mr. Bauman.")

RR 30, Mount Holly, NJ 08060.  (*Id.* ¶ 2.)

Scott Kavalek was employed by Vibra-Tech at the New Jersey office from April 1998 until his termination on May 30, 2008.[4] (Trial Transc. (D. Rudenko) 1/11/2012, 180:19.)  Scott was hired as an Area Manager of the New Jersey office, and during his tenure at Vibra-Tech was made a Vice-President and elected to the Board of Directors.  (*Id.* ¶ 4.)  Upon commencing employment with Vibra-Tech, Scott signed an employment agreement containing the following provisions:

> 2.   During the time of his/her employment with Employer, Employee will devote his/her entire time and energy to the furtherance of the business of Employer and shall not, in any advisory or other capacity, work for any individual, firm, or corporation other than Employer with regard to matters that would conflict with the business of employer without first having obtained the written consent thereto of Employer duly executed by an executive officer of Employer.

> 3.   It is recognized that the customer lists, files, books, records and accounts and all other information, data and records wherever located are the sole and exclusive property of Employer.  Employee will not, at any time, either himself/herself or through or with the aid or assistance of others, take, make available to anyone not authorized to receive it by written permission, divulge or use any customer list, file, book, record or account which is the property of Employer.  This prohibition includes all forms of computer programs and data.

---

[4]   The Court notes that the Joint Final Pre-Trial Order states the date of termination as May 31, 2008.

4.   Employee, at all times, recognizes and respects the advantageous business relationship which exists between Employer and its customers.  Employee expressly agrees to do nothing to interfere with that advantageous relationship during the term of employment with Employer or any time after that.

5.   Neither during the term of Employee's employment with Employer, nor thereafter, will he/she disclose to any third party or make any use of any secret process, trade secret or other confidential information or confidential knowledge relating to the business, merchandising or distributing methods, processes, sources of supply, techniques, products, inventions, devices or research of Employer or its subsidiaries or affiliated companies or of any persons, firms, corporation or other individuals with whom Employer had or shall, in the future have, any business dealings or relations.  Further, upon leaving the employ of Employer, Employee will not take with him/her any drawings, blueprint or other reproduction, or other specification, record or copy of confidential or proprietary material or information, without the prior written consent of any executive officer of Employer.

6.  Because of the special and unique services that he/she is bringing to his/her employment with Employer and because of the confidential nature of the information with which he/she will come in contact in the course of his/her employment with Employer, he/she will not, upon the termination of his/her employment with Employer, directly or indirectly, own, manage, operate, join, control, be employed by or participate in the management, operation or control of, or be connected in any manner with any business that deals in the same products sold or services rendered while in the employ of Employer.

(P-1.)

Roberta (Wright) Kavalek was employed at the Vibra-Tech New

7

Jersey office from September 1997 until December 2006.[5]  (Joint

Final Pretrial Order, Part II, ¶ 6.)  She began as a secretary

and later became the Office Manager.  (*Id.*)  Upon commencing

employment with Vibra-Tech, Roberta signed an employment

agreement containing the following provisions:

> 2.   Duties. [...] Employee acknowledges that
> he/she is a part-time employee of the
> Company.  Employee agrees nevertheless that
> he/she shall use his/her best efforts for the
> benefit of the Employer and shall not engage
> in any other employment of a full or part-
> time nature during the term of employment
> with the Company unless the Employee shall
> notify the Employer thereof in writing in
> advance of accepting such employment.
>
> 6.   Confidential Information.  The Employee
> agrees that all  formation information of a
> technical or business nature, such as know-
> how, trade secrets, business information,
> plans, data, processes, techniques, identity
> of customers and customer lists, pricing
> information, and instrument development (the
> "Confidential Information") acquired in the
> course of his/her employment under this
> Agreement is a valuable business property
> right of the Company.  The Employee covenants
> and agrees that such Confidential
> Information, whether in written, verbal or
> other form, shall not be disclosed to anyone
> outside the employment of the Company without
> the Company's written authorization.  The
> disclosure restriction shall apply during
> employment and after Employee's termination
> of employment with the Company, until the
> Confidential Information is generally
> available to the public.
>
> 7.   Return of Documents.  Upon the

---

[5]  On June 15, 2006, Scott Kavalek and Roberta Wright were
married.

> termination of this Agreement for any reason, the Employee shall forthwith return and deliver to the Company any properties belonging to the Company including, but not limited to, keys, credit cards, and equipment.  Moreover, the Employee shall not retain any original or copies of any books, papers, price lists, customer contracts, bid or customer lists, files books of account, notebooks or other documents or data relating to the Company or any of its operations, all of which materials are hereby agreed to be the property of the Company.

(P-2.)

Charles Bauman was hired as a field technician for Vibra-Tech's New Jersey office and was employed from June 2004 to November 2006.  (Joint Final Pretrial Order, Part II, ¶ 10.) Upon hire, Bauman signed an employment agreement with convenants and restrictions identical to those in Scott Kavalek's employment agreement.  (*Id.* ¶ 11.)  The Bauman Employment Agreement was signed by Scott Kavalek on behalf of Vibra-Tech and witnessed by Roberta Kavalek.  (*Id.* ¶ 12.)

On December 3, 2004, Scott and Roberta Kavalek incorporated Geotech, which is in the business of selling geotechnical equipment.  (*Id.* ¶¶ 13-14.)  Scott is the President of Geotech and Roberta is an employee of Geotech.  (*Id.* ¶¶ 15-16.)

On May 16, 2005, Roberta incorporated IGS and acts as its President.  (*Id.* ¶¶ 18-19.)  Since its incorporation in 2005, IGS performs vibration monitoring services and is a competitor of Vibra-Tech.  (*Id.* ¶ 20.)

The employment agreements at issue in this case are governed by Pennsylvania law, while the common law claims as well as the New Jersey Consumer Fraud Act claim are governed by New Jersey law. (*Id.* ¶¶ 23-24.)

## II. Findings of Fact

**A.  Vibra-Tech**

1.  Vibra-Tech works primarily in the area of vibration monitoring, but also installs geotechnical equipment, such as crack meters, tilt meters, and inclinometers.  (Trial Trans. (D. Rudenko) 1/11/2012, 110:21 - 121:6; Trial Trans. (D.T. Froedge) 1/18/2012, 107:9 - 107:23).

2.  Because of the specialized nature of the services Vibra-Tech provides, most new employees, including Scott Kavalek, are trained within the company.  Upon commencement of his employment, Scott received substantial training to acquaint him with the business of Vibra-Tech.  He also attended a variety of seminars and conferences during his employment to further his technical and management skills.  (Trial Trans. (D. Rudenko) 1/11/2012, 137:2 - 137:18, 140:25 - 141:5).

3.  Vibra-Tech employees establish close relationships with its clients.  Because of the specialized services Vibra-Tech performs and the safety issues involved, the clients must be confident that Vibra-Tech is able to protect them from future problems or solve existing problems.  Customer relationships are

important to Vibra-Tech's work.  Vibra-Tech is frequently called
by repeat clients that are prime contractors on major
construction projects and asked to submit a bid as a
subcontractor.  (Trial Trans. (G. Newmark) 1/12/2012, 131:12 -
131:21; Trial Trans. (D.T. Froedge) 1/18/2012, 131:15 - 131:20;
Trial Trans. (S. Kavalek) 1/26/2012, 95:3 - 96:3).

    4.  Marilyn Rochner was the Chief Financial Officer of Vibra-
Tech. Six months after the commencement of this action, on
November 21, 2008, Rochner passed away. (Trial Trans. (D.T.
Froedge) 1/18/2012, 119:8 - 119:9).

    5.  Vibra-Tech Area Managers serve a central role in the
company's operations.  They are responsible for promoting the
services and products of Vibra-Tech, conducting direct and
indirect sales, collecting past due accounts, attending trade
shows, soliciting new business, writing proposals and bids for
new business, providing support and assisting in the development
and implementation of promotional activities, strategies and
budgets.  Area Managers receive bonuses which are based upon the
profits generated within their area.  Area Managers are also
responsible for hiring all employees, firing all employees, and
scheduling all employees in their area offices.

    6.  As Area Manager of the New Jersey office, which covers New
Jersey, the five New York City boroughs and Long Island, Scott
Kavalek gained more than ten years of experience learning the

business of Vibra-Tech, fostering relationships with customers, earning customer trust, and developing the New Jersey office into a productive and profitable branch of Vibra-Tech.

7.  During Scott's tenure, the New Jersey office became one of the most successful at Vibra-Tech and he was therefore elected as a member of the Board of Directors on November 29, 2007.

8.  While employed at Vibra-Tech, Roberta was trained in vibration monitoring techniques and equipment, and gained knowledge of Vibra-Tech's customers and the vibration monitoring industry in general.  In addition to office duties, she perfoemd field work when necessary.  Field work included conducting vibration monitoring, pre-blast inspections, post-blast inspections, claim investigations, and environmental monitoring, as well as the operation of equipment.

9.  Vibra-Tech Office Managers are responsible for assisting the Area Manager in the day-to-day operations of the office, including preparing reports, preparing sales orders, collecting past due accounts and scheduling employee work assignments.

**B. IGS**

10.   Until recently, IGS conducted its business from 213 Front Street, Mt. Holly, NJ, which was and is the home address of the Kavaleks.  Recently, IGS opened a new office at 2800 Sylon Boulevard, Hainesport, NJ.

11.  Roberta Kavalek acted as the President and sole record

12

owner of IGS, performing various duties for the company including customer solicitation, contract negotiation, billing, field work, remote monitoring, and meeting with clients. (Trial Trans. (R. Kavalek) 1/17/2012, 99:15 - 100:2, 101:5 - 101:9; 1/25/2012, 7:11 - 7:13; P-313 at KE 0281). Scott Kavalek performed numerous services on behalf of IGS while he was still employed by Vibra-Tech, including customer solicitation, field work, remote monitoring, meeting with clients, billing clients, and contract negotiation.

12.  The Kavaleks used IGS's business accounts as if they were their own personal bank accounts, making large amounts of personal purchases on their company issued credit cards. (P-118; P-119; P-120). Those credit card bills were then paid using IGS company funds from IGS bank accounts. (Trial Trans. (R. Kavalek) 1/17/2012, 151:23 - 162:23; P-306J). In addition, Roberta Kavalek transferred $946,775 from the IGS business checking account to her own personal checking accounted between May 2006 and June 2011. (P-172). The Kavaleks also arranged for Roberta Kavalek's three teenaged children to receive $44,388 in payments from IGS. (P-173).

13.  From its creation, Roberta Kavalek withdrew hundreds of thousands of dollars from IGS either in the form of checks, cash withdrawals or electronic bank funds transfers. (Trial Trans. (R. Kavalek) 1/18/2012, 71:7 - 77:9; P-172). Two electronic

13

transfers totaling $145,000 from an IGS business checking account
to Roberta Kavalek's personal bank account were made on June 4,
2008, four days after the Complaint in this action was filed and
served on the Kavalek Defendants.  (Trial Trans. (R. Kavalek)
1/18/2012, 73:13 - 74:24; P-172).

14.  Of the five employees hired by IGS in its first five
years of operation, four were present or former Vibra-Tech
employees: Scott Kavalek, Roberta Kavalek, Charles Bauman, and
Michael Conrow.  (Trial Trans. (R. Kavalek) 1/26/2012, 28:22 -
31:13).

15.  Scott Kavalek never reported to anyone at Vibra-Tech that
he had a business relationship with IGS.  (Trial Trans. (D.T.
Froedge) 1/18/2012, 112:15 - 113:7; Trial Trans. (D. Petras)
1/19/2012, 138:17 - 138:19).  In fact, he affirmatively lied to
Douglas Rudenko and Sean Shamany about this at the time of his
termination interview, saying that neither he nor Roberta Kavalek
had any involvement with IGS.  (Trial Trans. (S. Shamany)
1/19/2012, 95:12 - 95:22; Trial Trans. (S. Kavalek) 1/17/2012,
93:18 - 93:24).

16.  Roberta Kavalek never reported to anyone at Vibra-Tech,
other than Scott Kavalek, that she had a business relationship
with IGS.  (Trial Trans. (D. Rudenko) 1/11/2012, 153:8 - 153:10;
Trial Trans. (D.T. Froedge) 1/18/2012, 112:15 - 113:7).

17.  Scott and Roberta Kavalek purposefully failed to disclose

14

to Vibra-Tech that they were the owners and employees of IGS. (Trial Trans. (R. Kavalek) 1/25/2012, 104:18 - 104:22).

18.   Scott and Roberta Kavalek failed to disclose their relationship with IGS to Vibra-Tech, in part, because they feared that Vibra-Tech would fire them for their disloyalty.   (Trial Trans. (R. Kavalek) 1/25/2012, 57:3 - 57:7; Trial Trans. (S. Kavalek) 1/26/2012, 97:25 - 98:6).

## C. Scott Kavalek's involvement with IGS

19.   Scott Kavalek has conducted business on behalf of IGS under the job titles "Vice President," "Senior Project Manager," and "Sales Representative."   (P-30; P-38; P-38A; P-38B; P-38C; P-38D; P-38E; P-38F; P-38G; P-38H; P-39; P-39A; P-39B; P-39C; P-39D; P-39E; P-39F; P-39G; P-39H; P-39I; P-39J; P-39K; P-39L; P-306K; P-124 at KE 2052 - 2053; P-313 at KE 0059, 1952; P-327; P-334 at McLAREN 708).

20.   Scott Kavalek set up the domain name for IGS's website, as well as IGS's e-mail system and all individual IGS e-mail accounts.   With Roberta Kavalek's knowledge and agreement, Scott Kavalek assigned several IGS e-mail addresses to himself.   Scott Kavalek thereafter used those addresses to conduct IGS business. (Trial Trans. (S. Kavalek) 1/13/2012, 49:3 - 49:9, 56:10 - 57:8).

21.   From IGS's formation, Scott Kavalek had check signing authority for the principal bank account of IGS.   On the signature card for the account, Scott Kavalek listed himself as

"Vice-President" of IGS.  The card was signed by both Scott and Roberta Kavalek, attesting to its accuracy.[6]  By signing the document the Kavaleks certified that "(1) I am the Secretary or Assistant Secretary of the Corporation named above, (2) the above named person(s) are these person(s) currently empowered to act under the Corporate resolutions authorizing this account and the banking services provided therein, (3) that the title and signature set forth opposite the names of each person are true and genuine." (P-306K; (Trial Trans. (S. Kavalek) 1/13/2012, 62:23 - 63:13, 65:17 - 66:10).

22.  Scott Kavalek was the drawer of seventeen IGS paychecks to Charles Bauman, including the first seven. All of these checks were issued to Bauman before Scott Kavalek left Vibra-Tech. (Trial Trans. (S. Kavalek) 1/13/2012, 68:16 - 69:4; P-129A). Scott Kavalek was also the drawer of numerous other checks issued on behalf of IGS.  (Trial Trans. (B. Lindenberg) 1/24/2012, 129:17 - 129:18; P-93E).  Scott Kavalek also endorsed for deposit numerous checks made payable to IGS.  (Trial Trans. (B. Lindenberg) 1/24/2012, 132:17 - 135:5; P-306C at BOA 676, 681, 686, 692, 695, 696, 717).

---

[6]  Scott Kavalek attempted to explain that the "Vice President" printed on the signature card was a joke, and that the bank representative present told him that it did not mean anything.  This is a highly dubious explanation that I do not credit.  (P-306K; (Trial Trans. (S. Kavalek) 1/13/2012, 62:23 - 63:13, 65:17 - 66:14).

23.  Scott Kavalek also had IGS credit cards issued in his name.  (Trial Trans. (R. Kavalek) 1/17/2012, 107:3 - 107:12; P-118).  The IGS credit cards issued in Scott Kavalek's name were used by him for over $60,000 in purchases.  (P-170).  All receipts for credit card purchases produced by the Kavalek Defendants were signed by Scott Kavalek.  (P-119 at D 00431 - 00433).

24.  During the time that he was still employed by Vibra-Tech, Scott Kavalek ordered computers on behalf of IGS.  (P-127; Trial Trans. (S. Kavalek) 1/13/2012, 99:24 - 102:10; P-124 at D 00333 -00335).

25.  During the time he was still employed by Vibra-Tech, Scott Kavalek communicated with the following manufacturers and suppliers on behalf of IGS:

a.  Bruel & Kjaer. (Trial Trans. (S. Kavalek) 1/13/2012, 102:11 - 103:9, 104:25 - 105:7; P-124 at D 00339, 00343-00344).

b.  Instantel. (Trial Trans. (S. Kavalek) 1/17/2012, 9:4 - 10:9; P-169A).

c.  RST Instruments. (Trial Trans. (S. Kavalek) 2/1/2012, 93:2 - 95:1; P-360 at RST 0102 - 0103; P-227).

26.  During the time that he was still employed by Vibra-Tech, Scott Kavalek communicated with or about the following IGS clients (who were also present or former Vibra-Tech clients) on behalf of IGS:

a.   McLaren Engineering: Port Imperial job.  (P-92; Trial Trans. (S. Kavalek) 1/13/2012, 105:18 - 110:5, 113:1 - 120:10, 141:9 - 142:15; 1/17/2012, 65:14 - 68:17; Trial Trans. (R. Kavalek) 1/25/2012, 221:3 - 222:13; P-124 at D 00434 - 00441, 00454 - 00589, 00617; P-334 at McLAREN 691).

b.   McLaren Engineering: Staten Island job.  (Trial Trans. (S. Kavalek) 1/13/2012, 126:2 - 127:21, 131:16 - 133:15; P-124 at D 00589 - 00595).

c.   Langan Engineering.  (Trial Trans. (S. Kavalek) 1/13/2012, 134:19 - 141:7; P-124 at D 00600 - 00602).

d.   Newmark Engineering. (Trial Trans. (S. Kavalek) 1/13/2012, 156:20 - 159:2; P-124 at D 007835 - 007845; Trial Trans. (G. Newmark) 1/23/2012, 11:7 - 11:19, 13:3 - 13:9, 14:23 - 15:7, 15:25 - 16:22).

e.   Kline Engineering: Astor Place job. (Trial Trans. (S. Kavalek) 1/13/2012, 169:20 - 171:9; P-124 at D 007855, 007856; P-326).

f.   Kline Engineering. (P-313 at KE 0058-60, 1951-52; P-124 at D 007879).

g.   Kline Engineering: Parkview job. (P-508 (Deposition of Marie Gardiner) at 39:14 - 40:9).

h.   Kline Engineering: 95th Street job. (P-508 (Deposition of Marie Gardiner) at 39:14 - 40:9).

i.   Atlantic Yards Development Corporation, Inc. (Trial

Trans. (S. Kavalek) 1/17/2012, 12:25 - 13:5; P-124 at D 007882; P-169 at D 00748).

27.   During the time that he was still employed by Vibra-Tech, Scott Kavalek performed field work on behalf of IGS for at least the following IGS clients who were also present or former Vibra-Tech clients:

a.   McLaren Engineering: Port Imperial job.  (Trial Trans. (S. Kavalek) 1/13/2012, 123:20 - 124:25; 1/17/2012, 65:14 - 68:17; Trial Trans. (R. Kavalek) 1/25/2012, 220:21 - 222:13; P-334 at McLAREN 691).

b.   McLaren Engineering: Staten Island job.  (Trial Trans. (S. Kavalek) 1/13/2012, 126:25 - 127:6).

c.   Kline Engineering: Astor Place job. (Trial Trans. (S. Kavalek) 1/13/2012, 162:15 - 163:15, 164:18 - 165:11; 1/17/2012, 24:21 - 25:8; Trial Trans. (R. Kavalek) 1/25/2012, 78:15 - 84:4; P-327; P-313 at KE 0231, 0232, 0281, 0464: P-508 at 37:4 - 37:19, 83:5 - 85:6).

d.   Kline Engineering: Rockview job. (Trial Trans. (S. Kavalek) 1/17/2012, 62:17 - 63:10).

e.   Kline Engineering: Parkview job. (P-508 (Deposition of Marie Gardiner) at 39:14 - 40:9).

f.   Kline Engineering: 95th Street job. (P-508 (Deposition of Marie Gardiner) at 39:14 - 40:9).

g.   Newmark Engineering.  (Trial Trans. (G. Newmark)

19

1/23/2012, 24:4 - 25:13)

28.   Scott Kavalek had extensive e-mail correspondence
concerning IGS business with numerous former, present and
potential Vibra-Tech customers using his IGS e-mail accounts,
scottk@igs-inc.com and scott@igs-inc.com.  Scott Kavalek's e-mail
communications contained signatures that provided his contact
information with IGS.  (Trial Trans. (S. Kavalek) 1/13/2012,
103:16 - 103:20; P-124 at D 00434 - 00441, 00493 - 00495, 00599,
00601 - 00606; P-232 at D 03488; P-236 at D 03511; P-326).

29.   All invoices from Instantel to IGS were directed to Scott
Kavalek.  (P-169A).

30.   For the Atlantic Yards job, Scott Kavalek set up the
business arrangement with the client so that Vibra-Tech would
provide some services, but IGS would provide rental of
seismographs.  (Trial Trans. (S. Kavalek) 1/17/2012, 12:25 -
13:5; P-124 at D 007882).  On March 29, 2007, Scott Kavalek
received an e-mail about the structure of the deal from the
attorney for the Atlantic Yards Development Corporation.  This
e-mail mentioned that IGS would provide equipment for the job.
(P-169 at D 00748).  On March 30, 2007, Scott Kavalek sent the
attorney's e-mail to Jason Gearlds, attorney for Vibra-Tech, but
deliberately removed the sentence regarding IGS.  (Trial Trans.
(S. Kavalek) 1/17/2012, 18:23 - 22:16; P-169 at D 00802-00803).
The only rational explanation for his action is that he was

20

attempting to prevent Vibra-Tech from learning of the existence
of IGS, IGS's involvement in the Atlantic Yards job, and his own
involvement with IGS.

31.  Despite IGS billing clients for hundreds of hours of work
performed by Scott Kavalek and Roberta Kavalek, the Kavaleks
maintained that they kept no records whatsoever of the time that
they spent performing work for IGS clients.  (Trial Trans. (S.
Kavalek) 1/13/2012, 165:9 - 166:19; Trial Trans. (R. Kavalek)
1/17/2012, 129:19 - 129:22).  I find this testimony not to be
credible.  It is apparent that the practice in the industry is to
maintain contemporaneous time records of work performed to be
used in billing clients.  The Kavalek Defendants' failure to
produce such records suggests that they would have demonstrated
Scott Kavalek's extensive involvement in the affairs of IGS.

32.  At trial Scott Kavalek continued to attempt to downplay
his role.  For example, with respect to the Kline Engineering
Astor Place job, for which Scott went to the job site on behalf
of IGS on close to 100 days, Scott Kavalek denied that this
constituted aiding a competitor of Vibra-Tech.  Instead, Scott
Kavalek claimed that by him performing work on IGS jobs, IGS was
actually helping him in his capacity as a Vibra-Tech Area
Manager.  (Trial Trans. (S. Kavalek) 1/26/2012, 113:3 - 115:6).

**D. Diversion of business from Vibra-Tech to IGS**

33.  During and after their tenure at Vibra-Tech, the Kavaleks

21

diverted present and prospective customers away from Vibra-Tech and to IGS.

34.   Glenn Newmark of Newmark Engineering, P.C. worked frequently over the years with Vibra-Tech when he was employed as a senior officer of Site Blauvelt, Inc., a major contractor. (Trial Trans. (G. Newmark) 1/12/2012, 133:5 - 135:3).  Because of his positive experiences having Vibra-Tech perform vibration monitoring services under Scott Kavalek's supervision, Newmark approached Scott Kavalek for services after he stared his own company, Newmark Engineering P.C., on September 23, 2005.  (Trial Trans. (G. Newmark) 1/12/2012, 135:14 - 137:2; Trial Trans. (S. Kavalek) 1/13/2012, 5:4 - 5:7).  Newmark called Scott Kavalek and requested that Vibra-Tech provide services on the Roslyn Viaduct job, which his company was undertaking. Scott Kavalek informed Newmark that his "new company" IGS could perform the services. (Trial Trans. (G. Newmark) 1/12/2012, 139:10 - 140:23).  Although he was still Area Manager for Vibra-Tech, Scott Kavalek nonetheless diverted Newmark's business to IGS.  (Trial Trans. (G. Newmark) 1/12/2012, 138:14 - 138:24).

35.   The principal IGS contact for Newmark was Scott Kavalek until this lawsuit was filed in June 2008, after which he dealt somewhat more with Roberta Kavalek.  Prior to June 2008, Newmark had only limited contact with Roberta Kavalek on IGS matters. (Trial Trans. (G. Newmark) 1/12/2012, 127:23 - 128:4, 141:8 -

142:15).  Scott Kavalek also prepared bills for Newmark on behalf of IGS and communicated with Newmark about billing issues. (P-124 at D 007827, 007835).

36.  In 2006, Scott Kavalek received a phone call from Ray Volpe at McLaren Engineering, a long-standing Vibra-Tech client, asking that Vibra-Tech perform certain inclinometer measurements on a project known as Port Imperial.  Scott Kavalek sent the client to IGS instead of having Vibra-Tech perform the work. Scott Kavalek actually performed most of the work which IGS billed McLaren for on this job.  (Trial Trans. (S. Kavalek) 1/13/2012, 107:7 - 110:5; 1/17/2012, 71:21 - 71:25).

37.  Scott Kavalek received a later call from McLaren Engineering asking that Vibra-Tech perform vibration monitoring at a job on Staten Island.  Scott Kavalek again referred the client to IGS instead of having Vibra-Tech perform the job.  Then Scott Kavalek did the work for IGS.  (Trial Trans. (S. Kavalek) 1/13/2012, 127:19 - 127:21; 1/26/2012, 209:11 - 209:16).

38.  The Atlantic Yards project was a job performed on behalf of Forrest City Ratner Corporation ("Forrest City").  While Vibra-Tech provided vibration monitoring services, Scott Kavalek arranged for IGS to rent the seismographs to Forrest City that Vibra-Tech would monitor.  (Trial Trans. (S. Kavalek) 1/17/2012, 12:15 - 20:10).  Scott Kavalek originally bid on the Atlantic Yards job on behalf of Vibra-Tech and secured the job. However,

23

he thereafter structured the contractual arrangements so that IGS would provide seismograph rentals to Forrest City for the job instead of Vibra-Tech.  Scott Kavalek also structured the deal so that IGS would be paid all of its rental fees "up front," which assisted IGS because IGS had no capital to expend at the time the job began.  The Atlantic Yards job was one of the largest jobs IGS completed, resulting in $245,500 of revenue to IGS.  (P-140; P-169B; Trial Trans. (S. Kavalek) 1/17/2012, 12:25 - 13:5; 1/31/2012, 35:12 - 48:4; P-12 at 6a).

39.  Despite the Kavalek Defendants' contention that since IGS was mentioned in the contract and therefore Vibra-Tech knew or should have known of IGS's involvement in the project, IGS was only mentioned in one sentence of a seven-page single-spaced contract, and then only obliquely.[7]  The contract also specifically stated that Vibra-Tech "shall provide all labor, materials, equipment, and services required to perform the scope of the work."  (Trial Trans. (D.T. Froedge) 1/19/2012, 53:9 - 55:14; P-362 at VT0817 - 0824; P-362 at VT 0817, VT 0823-0824).

---

[7]  With respect to IGS, the contract states:
> If IGS agrees in writing to retain responsibility for damage to its equipment caused by Consultant, Consultant shall not be liable for any damage to such equipment; otherwise Consultant shall be responsible for any damage done to seismographs by its employees or subconsultants, and shall reimburse Owner for any costs incurred to IGS because of such damage.

(P-362 at VT0823, section II, ¶ 2.)

40.  Scott Kavalek initially solicited and secured Kline
Engineering P.C. as a client for Vibra-Tech in 2005.  (P-508
(Deposition of Marie Gardiner) at 26:23 - 28:9).  Kline
Engineering subcontracted numerous vibration monitoring and crack
metering work to Vibra-Tech.  (P-508 (Deposition of Marie
Gardiner) at 23:5 - 24:24, 25:8 - 26:22).

41.  Eventually, Kline Engineering started subcontracting its
vibration monitoring work to IGS.  This occurred because Kline
called Scott Kavalek when it needed vibration monitoring services
and Scott Kavalek diverted the business from Vibra-Tech to IGS.
(P-508 (Deposition of Marie Gardiner) at 35:22 - 36:5, 41:4 -
41:12).

42.  On jobs performed by IGS for Kline Engineering, Scott
Kavalek, Roberta Kavalek, and Charles Bauman all performed field
work.  (P-508 (Deposition of Marie Gardiner) at 37:4 - 37:19;
P-509 at 15:2 - 15:12).  Scott Kavalek submitted proposals to
Kline Engineering on behalf of IGS, and signed them as IGS's
"Vice President" and "Senior Project Manager."  (P-142; P-314;
P-327; P-508 (Deposition of Marie Gardiner) at 40:10 - 41:12;
P-313 at KE0059, 1952).

43.  After the transition from Vibra-Tech to IGS, Kline
Engineering's point of contact for the provision of vibration
monitoring services continued to be Scott Kavalek, now acting on
behalf of IGS instead of Vibra-Tech.  (P-508 (Deposition of Marie

Gardiner) at 41:5 - 42:9; P-509 (Deposition of Arnold Kline) at
17:19 - 18:12).  It is reasonable to infer that Scott Kavalek
diverted Kline Engineering's vibration monitoring business from
Vibra-Tech to IGS.  This inference is also supported by the
voluminous amount of contacts that Scott Kavalek had with Kline
over the term of their relationship at IGS.  (*See supra* ¶¶ 26e-h,
27c-f).

44.  Vibra-Tech issued a laptop computer to Roberta Kavalek
during her employment at the company.  She did not return the
laptop when she left Vibra-Tech in December 2006.  In
approximately February or March 2008, some fourteen months after
she left Vibra-Tech for IGS, Vibra-Tech discovered the laptop
previously issued to Roberta Kavalek in its Mount Holly equipment
garage.  (Trial Trans. (D. Petras) 1/19/2012, 127:9 - 128:2).

45.  Diane Petras, Vibra-Tech's current New Jersey Office
Manager and Roberta's successor, examined the laptop and
discovered "Blastware", a software program utilized by Vibra-Tech
to collect, organize and manage data from seismographs.  Petras
also discovered Blastware files in the recycling bin of the
computer, indicating that Roberta Kavalek had attempted to delete
the files.  Petras determined that the Blastware documents were
related to projects performed by IGS in 2006 and 2007.  The
Blastware documents also demonstrated that the Kavaleks converted
Vibra-Tech seismographs and installed them on a job secured by

IGS for Kline Engineering, P.C. (P-123; Trial Trans. (D. Petras) 1/19/2012, 128:3 - 137:1; P-74; P-75).

46.  In 2006, IGS installed Vibra-Tech seismographs on an IGS job for Kline Engineering called "Astor Place," because IGS did not have the required equipment.  Scott Kavalek simply took Vibra-Tech's equipment from Vibra-Tech's stockroom for IGS use on the Astor Place job.  (Trial. Trans. (S. Kavalek) 1/13/2012, 173:25 - 175:21; 1/17/2012, 36:15 - 38:13).  All of this occurred while both Kavaleks were still full-time employees of Vibra-Tech.

47.  With respect to 281 Broadway Holdings, also known as the 57 Reade Street job, Vibra-Tech performed vibration monitoring on the demolition phase.  IGS performed vibration monitoring on the subsequent construction phase of the job.  IGS secured this contract in January 2007, only six weeks after Roberta Kavalek left her position at Vibra-Tech.  Despite having knowledge of the project, Scott Kavalek failed to submit a bid for the construction phase and otherwise did not attempt to secure the work for Vibra-Tech.  (P-168; P-303; P-304; P-305; Trial Trans. (S. Kavalek) 2/1/2012, 40:12 - 43:19).

48.  In proposals sent on behalf of IGS to Kline Engineering, the Kavaleks simply copied similar proposals that they had used at Vibra-Tech.  The formatting and much of the phrasing of the IGS proposals was identical to what Vibra-Tech used.  (Trial Trans. (S. Kavalek) 1/17/2012, 56:16 - 60:17; P-313 at KE 001 -

003, 1951-1952).

49.  Roberta Kavalek relied on Scott Kavalek to secure
business for IGS.  In a proposal submitted to McLaren
Engineering, Roberta Kavalek signed Scott Kavalek's name at the
end of the proposal.  Roberta Kavalek admitted that the reason
she signed Scott Kavalek's name on the proposal was because Scott
Kavalek made the initial contact with the client.  (Trial Trans.
(S. Kavalek) 1/17/2012, 72:22 - 73:12; 1/18/2012, 92:21 - 94:25;
P-334 at McLAREN 707-708).

50.  Roberta Kavalek also admitted that Scott Kavalek made the
initial contact with Kline Engineering for the Port Imperial job,
and was responsible for IGS being able to secure the Atlantic
Yards job.  (Trial Trans. (R. Kavalek) 1/25/2012, 221:3 - 222:13,
224:4 - 225:9).

51.  Roberta Kavalek also relied on Scott Kavalek's ability to
prevent Vibra-Tech from competing with IGS for any jobs.  From
the formation of IGS in 2005 until the termination of his
employment with Vibra-Tech in May 2008, Scott Kavalek never
submitted a proposal on behalf of Vibra-Tech for any job that IGS
bid on.[8] (Trial Trans. (S. Kavalek) 2/1/2012, 101:12 - 101:18).

---

[8]  In closing argument, counsel for Scott Kavalek asserted
that Vibra-Tech submitted a competing bid on the Turner job,
which IGS ultimately secured.  However, by Scott Kavalek's own
testimony at trial, he never submitted a bid on behalf of Vibra-
Tech for any job bid on by IGS.  (Trial Trans. (S. Kavalek)
2/1/2012, 101:12 - 101:18).

I find this fact to be remarkable.  This could have happened only if Scott and Roberta Kavalek were actively sharing information on what business and what specific jobs IGS was pursuing.  I further find that it is proof that Scott Kavalek and Roberta Kavalek were in active collusion to prevent Vibra-Tech from submitting competing proposals.

52.  Former Vibra-Tech customers who became IGS customers, either while Scott Kavalek was still employed by Vibra-Tech or during the two-year non-competition period after the termination of Scott Kavalek's employment, included:

    a.   The Atlantic Yards Development Co., LLC (P-7)

    b.   Cutrupi & Company (Trial Trans. (R. Kavalek) 1/17/2012, 121:3 - 122:21).

    c.   Kline Engineering, P.C. (Trial Trans. (R. Kavalek) 1/17/2012, 121:3 - 122:21; P-7).

    d.   Langan Engineering & Environmental Services (Trial Trans. (R. Kavalek) 1/17/2012, 121:3 - 122:21; P-7).

    e.   McLaren Engineering, P.C. (P-7)

    f.   Newmark Engineering, P.C. (Trial Trans. (R. Kavalek) 1/17/2012, 121:3 - 122:21; P-7).

    g.   Quality Control Laboratories, LLC

    h.   Site - Blauvelt Engineers

    i.   Turner Construction Company

53.  Gross sales by IGS to the former Vibra-Tech customers who

became IGS customers between 2005 and 2009 totaled $1,526,359. (P-12 at 6a).

54.  Potential Vibra-Tech customers who became IGS customers, either while Scott Kavalek was still employed by Vibra-Tech or during the two-year non-competition period after the termination of Scott Kavalek's employment, included:

    a.  11-01 43rd Avenue, LLC

    b.  281 Broadway Holdings, LLC

    c.  A-1 Testing

    d.  BTA Building & Development

    e.  Extell West 57th, LLC

    f.  Gladden Properties, LLC

    g.  Mueser Rutledge Consulting Engineers

    h.  Risk Reduction Resources, Inc.

    i.  Shen Milsom & Wilke, Inc.

    j.  TRC Environment Corp

    k.  Vanderweil Engineers

    l.  Velocity at Greystone, LLC

55.  Gross IGS sales to these potential Vibra-Tech customers who became IGS customers between 2006 and 2009 totaled $874,232. (P-12 at 6a).

56.  Absent the actions of Scott Kavalek to divert customers to IGS, it is more likely than not that the potential Vibra-Tech customers would have become Vibra-Tech customers because the two

companies provided comparable pricing, products, and services performed by the same individuals.  The fact that Scott Kavalek was able to solicit these customers for IGS provides substantial evidence that he could have done the same for Vibra-Tech but for his actions to divert the customers to IGS.

57.  While the Kavalek Defendants have argued that Vibra-Tech, through its CFO, Marilyn Rochner, declined to do business with certain clients, notably Kline Engineering, due to their poor payment record, I do not credit this argument.[9] The only evidence the Kavalek Defendants have advanced to support their position is self-serving testimony claiming that Rochner told them not to do business with Kline Engineering.

58.  The Kavalek Defendants claim that Vibra-Tech's "COD list" supports their argument.  A client who is substantially late in paying its bill would be placed on the COD list, which means that an Area Manager could not do business with that client unless the outstanding balance was paid, the outstanding debt was placed on a credit card, or the project was undertaken on a COD basis. Thus, a client's placement on the COD list did not forbid an Area

---

[9]  Moreover, as part of their Rule 26 initial disclosures, the Kavalek Defendants listed numerous Vibra-Tech employees as "persons likely to have information that may be used to support" their case, but did not list Marilyn Rochner. They did, however, list three other Vibra-Tech employees.  (Defendants' Initial Disclosures Pursuant to Rule 26).  The Court further notes that Defendants' Rule 26 disclosures were served on Plaintiff on October 21, 2008 (*see* letter dated March 28, 2012, Dkt. No. 303), prior to Marilyn Rochner's death.

Manager from doing business with the client.  It only meant that
an Area Manager would need to work out an arrangement up-front,
such as one where the client would pay for services when
rendered.  (Trial Trans. (D. Rudenko) 1/11/2012, 167:16 - 171:19;
Trial Trans. (D.T. Froedge) 1/18/2012, 119:18 - 120:17).

59.  The Kavalek Defendants also claim that handwritten notes
from Rochner exist which would substantiate their claims, but
they have produced no documentary evidence that supports their
position. Between the filing of this suit and the date of trial,
Rochner passed away and is unable to rebut their testimony.

60.  The most likely explanation for why Kline did not pay its
debts to Vibra-Tech is that the Kavalek Defendants did not pursue
collection of these debts on behalf of Vibra-Tech because they
knew the collections process would negatively affect IGS.  When
Diane Petras requested permission from Scott Kavalek to send
Kline Engineering's past due account to collections in May of
2008, Scott Kavalek specifically told her not to pursue
collections efforts against Kline Engineering.  (Trial Trans. (D.
Petras) 1/19/2012, 142:15 - 144:9; P-63).

61.  The Kavalek Defendants contend that Vibra-Tech declined
to perform certain jobs later completed by IGS due to risks
inherent in the jobs.  (Trial Trans. (S. Kavalek) 1/13/2012,
24:25 - 25:4).  I do not credit this argument.  While businesses
consider the risk of undertaking individual jobs, including the

risks of non-payment and liability, the Kavalek Defendants have
presented no evidence that any of the jobs in question bore any
risk outside the typical range of risk in the vibration
monitoring business.  As to the risk of non-payment, the evidence
presented in this case directly contradicts the Kavalek
Defendants' claims.  There is ample evidence that allegedly risky
clients such as Newmark Engineering and Kline Engineering went on
to provide hundreds of thousands of dollars of revenue to IGS.
Newmark was responsible for $274,000 in IGS revenue and Kline was
responsible for $405,000 in IGS revenue between 2005 and the end
of 2009.  (P-12 at 6a).

62.  The Kavalek Defendants have argued that Vibra-Tech was
unable to perform certain jobs, such as the Atlantic Yards job
and the Avalon Bay job, due to an inability to supply necessary
quantities of seismographs or to purchase Instantel-manufactured
and branded seismographs, instead of Instantel-manufactured and
Vibra-Tech-branded seismographs.  The Kavalek Defendants contend
that Vibra-Tech was contractually precluded from purchasing
Instantel-branded machines.  (Trial Trans. (S. Kavalek)
1/13/2012, 13:14 - 14:17).  I do not credit this argument for
several reasons.  First, the Kavalek Defendants have provided no
rational explanation as to why Instantel, a manufacturer of
seismographs, would not be willing to sell any of its
seismographs to Vibra-Tech, a larger purchaser of seismographs

than IGS.  Second, the Kavalek Defendants have been unable to
provide any contract between Vibra-Tech and Instantel which
precludes Vibra-Tech from purchasing Instantel-branded
seismographs for use on the jobs. Third, Vibra-Tech's CEO
testified that Vibra-Tech had sufficient quantities of
seismographs to perform the Atlantic Yards job.  (Trial Trans.
(D.T. Froedge) 1/18/2012, 132:4 - 133:10). Finally, it is not
clear that there was any need for Vibra-Tech to purchase
Instantel-branded seismographs because it could have used its own
Vibra-Tech branded seismographs.  All the Kavalek Defendants have
provided in this regard is self-serving testimony that appears
designed to minimize their own wrongdoing.  For example, Scott
Kavalek claimed that Glenn Newmark reported that certain
Vibra-Tech seismographs had a virus, but Scott never brought this
problem to the attention of his superiors at Vibra-Tech.  (Trial
Trans. (S. Kavalek) 1/13/2012, 12:22 - 16:21: 1/26/2012, 168:8 -
170:20).  Similarly, Scott Kavalek's failure to bring any alleged
seismograph supply problem to the attention of his superiors at
Vibra-Tech suggests that there was no such problem.  (Trial
Trans. (S. Kavalek) 1/13/2012, 14:20 - 14:23).

  63.  Despite the Kavalek Defendants' claims that they were
able to provide necessary equipment that Vibra-Tech could not
provide, IGS itself was unable to provide necessary equipment and
the Kavalek Defendants secretly used Vibra-Tech equipment.  One

example of this conduct was the Astor Place job performed for
Kline Engineering.  (Trial. Trans. (S. Kavalek) 1/13/2012, 173:25
- 175:21; Trial Trans. (D. Petras) 1/19/2012, 128:3 - 137:1;
P-74; P-75).

64.  The Kavalek Defendants have also argued that certain
clients did not use Vibra-Tech because Vibra-Tech did not provide
web-based monitoring of seismographs.  I do not credit this
argument.  Vibra-Tech had the capability to provide web-based
delivery of seismograph data and has had that capability since
2003.  (Trial Trans. (D.T. Froedge) 1/18/2012, 126:18 - 127:14).
While it is Vibra-Tech's practice to have a technician examine
the data before making the data available for client viewing, if
the client had insisted on unfilitered data, Vibra-Tech would have
provided that service.  (Trial Trans. (D.T. Froedge) 1/18/2012,
127:15 - 128:11).

65.  Despite the Kavalek Defendants' claims that Vibra-Tech's
alleged failure to offer this kind of monitoring prevented
Vibra-Tech from performing certain jobs, Scott Kavalek never
informed his superiors at Vibra-Tech of any particular jobs that
Vibra-Tech could perform if only it would provide these services.
(Trial Trans. (D.T. Froedge) 1/18/2012, 128:12 - 128:14).
Furthermore, Roberta Kavalek was unable to remember any job that
Vibra-Tech was unable to bid on or obtain because of an inability
to conduct web-based monitoring.  (Trial Trans. (R. Kavalek)

1/25/2012, 128:12 - 128:25).

66.  The Kavaleks arranged for Charles Bauman, a Vibra-Tech
Field Technician from 2004 to 2006, to work for IGS
simultaneously while employed at Vibra-Tech.  Beginning in 2005
and while still employed by Vibra-Tech under the supervision of
the Kavaleks, Bauman performed Field Technician duties for IGS on
projects for Kline Engineering, P.C. and other present or former
Vibra-Tech customers.  (Trial Trans. (S. Kavalek) 1/13/2012, 77:2
- 77:8; Trial Trans. (R. Kavalek) 1/17/2012, 126:1 - 134:24;
1/26/2012, 26:3 - 27:18; P-93C).  On a number of occasions, the
Kavaleks actually scheduled Bauman to work full days for IGS
customers when he was being paid to work for Vibra-Tech.  (Trial
Trans. (R. Kavalek) 1/26/2012, 57:10 - 59:18; P-406). He
continued his dual role until he ultimately left Vibra-Tech to
work for IGS full-time in November 2006.

67.  During the term of his employment with IGS and up to the
end of his two-year non-competition covenant with Vibra-Tech,
Charles Bauman worked on projects for IGS for former Vibra-Tech
customers who became IGS customers, including:

a.   Kline Engineering, P.C. (Trial Trans. (S. Kavalek)
1/17/2012, 39:21 - 40:3; Trial Trans. (R. Kavalek) 1/17/2012,
126:1 - 127:7, 130:9 - 134:24; P-313 at KE 0052-6; P-406; P-411;
P-508 at 37:4 - 37:12, 38:23 - 39:5; P-509 at 15:2 - 15:12).

b.   Langan Engineering & Environmental Services (P-406;

P-408)

    c.   Newmark Engineering P.C. (P-352; P-406)

68.  IGS sales to these Vibra-Tech customers between 2006 and 2009 totaled $827,500.

69.  During the time of his employment with IGS and up to the end of his two-year non-competition covenant with Vibra-Tech, Charles Bauman worked on projects for potential Vibra-Tech customers who became IGS customers, including:

    a.   11-01 43rd Avenue, LLC

    b.   Gladden Properties, LLC

    c.   Velocity at Greystone, LLC

70.  IGS sales to these potential Vibra-Tech customers totaled $134,847.

**E.  Geotech**

71.  Geotech was and is in the business of selling geotechnical equipment.  (Trial Trans. (S. Kavalek) 1/13/2012, 35:18 - 35:24).  Geotech is also in the business of providing geotechnical services, such as sound and slip plane monitoring. Geotech also provides services to IGS as a subcontractor.  (Trial Trans. (R. Kavalek) 1/17/2012, 143:4 - 143:17; 1/18/2012, 66:19 - 66:23; P-337 at Newmark 599).

72.  Geotech conducted its business from 213 Front Street, Mt. Holly, NJ, which was and is the home of the Kavaleks.  With IGS, Geotech recently opened a new office at 2800 Sylon Boulevard,

Hainesport, NJ.  (Trial Trans. (R. Kavalek) 1/17/2012, 114:10 -
117:15).

73.  According to Geotech's corporate records, Scott Kavalek
owns 60% of the stock of Geotech and Roberta Kavalek owns 40%.
(Trial Trans. (S. Kavalek) 1/13/2012, 3:15 - 3:19; Trial Trans.
(R. Kavalek) 1/17/2012, 100:21 - 101:4; P-201)

74.  Scott Kavalek is and since its formation has been the
President of Geotech.  (Trial Trans. (S. Kavalek) 1/13/2012, 3:15
- 3:19).  He also set up its website.  (Trial Trans. (S. Kavalek)
1/13/2012, 48:13 - 48:22).

75.  Roberta Kavalek is and has been since its formation the
Vice-President, Secretary, and an employee of Geotech.  Roberta
Kavalek performed all of Geotech's bookkeeping.  Roberta
performed the great majority of Geotech's billing to Vibra-Tech.
She also performed product ordering and payment duties for
Geotech.  (Trial Trans. (S. Kavalek) 1/17/2012, 82:5 - 82:14;
Trial Trans. (R. Kavalek) 1/17/2012, 100:13 - 100:15; 1/18/2012,
81:10 - 81:12; 1/26/2012, 20:25 - 21:9).  Roberta Kavalek was an
authorized signer for the Geotech bank accounts.  (Trial Trans.
(R. Kavalek) 1/17/2012, 167:23 - 167:24).  Roberta Kavalek was
paid income from Geotech, which she reported on her taxes.
(Trial Trans. (R. Kavalek) 1/18/2012, 88:5 - 88:8; P-158 at D
5869).

76.  Roberta Kavalek communicated with equipment suppliers,

38

such as Canary Systems and RST Instruments, on behalf of Geotech while using her personal Geotech e-mail address.  (Trial Trans. (S. Kavalek) 2/1/2012, 93:2 - 95:1; P-360 at RST 0102 - 0103; P-227).

77.  From 2004 until the termination of the employment of each at Vibra-Tech, Scott and Roberta Kavalek conducted the business of Geotech while simultaneously employed by Vibra-Tech.

78.  Scott Kavalek never reported to anyone at Vibra-Tech that he had a business relationship with Geotech.  (Trial Trans. (S. Kavalek) 1/13/2012, 39:13 - 39:15; 1/17/2012, 88:3 - 88:8; Trial Trans. (D.T. Froedge) 1/18/2012, 112:15 - 113:7; Trial Trans. (S. Shamany) 1/19/2012, 94:2 - 94:7).

79.  Roberta Kavalek never reported to anyone at Vibra-Tech, other than Scott Kavalek, that she had a business relationship with Geotech.  (Trial Trans. (D.T. Froedge) 1/18/2012, 112:15 - 113:7).

80.  Scott or Roberta Kavalek wrote and signed all of the checks on behalf of Geotech.  (Trial Trans. (R. Kavalek) 1/17/2012, 108:18 - 108:21; P-306G).

81.  A few months prior to Geotech's incorporation in late 2004, Scott Kavalek contacted RST Instruments, a geotechnical equipment manufacturer, about becoming its representative in the New York City area.  Scott Kavalek sent a lengthy solicitation e-mail from his personal AOL e-mail address and not his

Vibra-Tech e-mail address, even though the use of his Vibra-Tech e-mail address and signature would have carried more weight with a distributor.  Scott Kavalek failed to notify anyone at Vibra-Tech of his attempt to become an RST distributor.[10]  (Trial Trans. (S. Kavalek) 2/1/2012, 74:17 - 86:2; P-360 at RST 0261, 0262).

82.  Scott Kavalek made an agreement with RST Instruments whereby he would personally receive commissions from RST based on Vibra-Tech's purchases of equipment from RST.  As part of this effort, he requested equipment catalogs from RST so that he could supply them to potential customers.  Roberta Kavalek communicated with RST in May 2005 on behalf of Geotech for the purpose of obtaining equipment catalogs. (Trial Trans. (S. Kavalek) 2/1/2012, 74:17 - 86:2; P-360 at RST 0102 - 0103, 0200, 0202, 0242-3, 0261, 0262).  RST's first invoices to Geotech show "commissions" paid to Geotech for sales made previously to Vibra-Tech.  (P-360A).

83.  After Geotech's incorporation, the RST kickback scheme was modified so that Geotech would make purchases directly from RST, then resell that equipment to Vibra-Tech at a markup. Invoices from RST detail that Geotech received a 15% sales

---

[10]  Scott Kavalek contends that he proposed the RST distributorship opportunity to Vibra-Tech, but that it was rejected by Vibra-Tech's CEO.  (Trial Transcript (S. Kavalek) 1/31/12, 89:2-24).  I do not credit this self-serving testimony.

commission on certain equipment purchased by Vibra-Tech from RST
from November of 2004 until January of 2005.  (Trial Trans. (S.
Kavalek) 2/1/2012, 74:17 - 86:2; P-360 at RST 0200, 0202, 0261,
0262; P-360A).

84.  From February 2005 to April 2008, Scott Kavalek, through
his position as Vibra-Tech's Area Manager, caused Vibra-Tech to
purchase equipment from Geotech.  Vibra-Tech could have purchased
the same equipment directly from suppliers at a lower price, but
Scott Kavalek misused his authority as Area Manager to demand and
authorize purchases through Geotech. (Trial Trans. (S. Kavalek)
1/13/2012, 33:24 - 36:12; Trial Trans. (D.T. Froedge) 1/18/2012,
140:22 - 141:3).

85.  Scott Kavalek, in his capacity as Area Manager, decided
what equipment Vibra-Tech ordered from Geotech.  (Trial Trans.
(D. Rudenko) 1/11/2012, 145:7 - 145:24; Trial Trans. (S. Kavalek)
1/17/2012, 6:1 - 6:9).

86.  Roberta Kavalek issued the invoices to Vibra-Tech on
behalf of Geotech.  (Trial Trans. (S. Kavalek) 1/17/2012, 82:8 -
82:14).

87.  Before Vibra-Tech discovered that the Kavaleks were
actually the owners and operators of Geotech, the Kavaleks had
caused Vibra-Tech to purchase more than $279,000 in equipment
from Geotech. (P-81; P-93; P-209; Trial Trans. (S. Kavalek)
1/13/2012, 37:14 - 38:16; Trial Trans. (D.T. Froedge) 1/18/2012,

138:13 - 138:22; Trial Trans. (S. Shamany) 1/19/2012, 90:16 - 90:25).

88.  Scott Kavalek determined what prices and therefore what markup to charge Vibra-Tech for equipment sold by Geotech. (Trial Trans. (S. Kavalek) 1/17/2012, 89:9 - 89:20).

89.  On April 8, 2008 Scott Kavalek caused Vibra-Tech to place an order with Geotech for 25 new tilt beams for the Oliver House project at a cost of $15,375.  (Trial Trans. (S. Kavalek) 1/17/2012, 75:22 - 76:25; P-209 at Invoice 8040801).  The 25 tilt beams that were supplied by Geotech were not new, but were instead used tilt beams already owned by Vibra-Tech, which Vibra-Tech had purchased and used on another project known as Avalon Bay in 2003. Vibra-Tech was contractually obligated to remove the tilt-beams after the Avalon Bay job was completed. (Trial Trans. (D.T. Froedge) 1/18/2012, 141:4 - 141:21; 1/19/2012, 62:16 - 64:3; P-214 at VT 4899).  Pursuant to the contract, the beams were salvaged by a crew of Vibra-Tech employees, including Scott Kavalek, and were subsequently reconditioned by Vibra-Tech employees.  (Trial Trans. (S. Kavalek) 1/17/2012, 77:1 - 81:3).  Scott Kavalek did not disclose the origin of the beams to his superiors at Vibra-Tech.  (Trial Trans. (S. Kavalek) 1/17/2012, 87:20 - 87:24).

90.  The Kavalek Defendants have argued that Geotech's sales of equipment to Vibra-Tech provided a benefit to Vibra-Tech in

that Geotech was supposedly able to obtain lower prices from
suppliers due to its status as a distributor and to pass those
lower costs on to Vibra-Tech.  I do not credit this argument.
The Kavalek Defendants have provided no credible evidence as to
why the various suppliers would not have provided products to
Vibra-Tech at the same price that they were provided to Geotech.
If this was indeed a benefit to Vibra-Tech, it would have made
sense for the Kavalek Defendants to disclose this information to
their superiors at Vibra-Tech.  They did not do so and, in fact,
consciously concealed that relationship.  (Trial Trans. (S.
Kavalek) 1/13/2012, 40:25 - 41:2). If distributorship agreements
provided lower prices to Geotech, then it stands to reason that
Vibra-Tech should have been able to obtain the same
distributorship agreements and the same prices since Geotech was
operated by Vibra-Tech employees.  Even if Geotech did obtain
lower prices from suppliers than those Vibra-Tech could have
obtained, there is only a benefit to Vibra-Tech if Geotech's
profit margin on each sale to Vibra-Tech did not exceed the
amount of price advantage that Geotech obtained.[11]

---

[11]   The price that Geotech paid for the equipment remains
unclear.  Scott Kavalek created an exhibit which allegedly
demonstrated the financial benefits Vibra-Tech received from
Geotech on an individual sale basis.  (Trial Trans. (S. Kavalek)
1/31/2012, 99:7 - 99:24; D-54 (not in evidence)).  Defendants'
Exhibit 54 purported to show that Vibra-Tech paid less to Geotech
than the "list price" for specific items, and that this
constituted a benefit that Geotech conferred on Vibra-Tech.  As
was amply demonstrated during cross-examination, the supposed

91.  IGS and Geotech were substantially intertwined.  IGS and
Geotech shared the same office space, which was in a single room
in the Kavaleks' home. (Trial Trans. (R. Kavalek) 1/17/2012,
114:10 - 117:15; P-145A). IGS provided customers with a document
which claimed that IGS was a distributor for several equipment
suppliers, including Campbell Scientific, RST Instruments and
Airlink, when it was actually Geotech that was a distributor for
these suppliers.  (Trial Trans. (R. Kavalek) 1/17/2012, 136:16 -
137:17; P-357 at VAN 022-4). Geotech and IGS shared the fax
number at the Kavaleks' home. (Trial Trans. (S. Kavalek)
2/1/2012, 90:21 - 91:2; P-360 at RST 0245). Geotech and IGS
shared the same desktop computer in the Kavalek home and both
Kavaleks had access to it. Likewise, each Kavalek had free access
to each other's e-mail accounts, including Scott Kavalek's
Vibra-Tech account. (Trial Trans. (S. Kavalek) 1/13/2012, 49:22 -
50:4; P-507 1/8/2010 (Deposition of S. Kavalek) at 30:2 - 30:24).
There were numerous substantial case transfers between the
companies. (P-171).

**F. Scott Kavalek's termination**

92.  At the conclusion of an investigation into Scott
Kavalek's conduct, on May 30, 2008, Douglas Rudenko and Sean

---

list price information was from exceedingly questionable sources,
was not for the same products that Geotech sold and Vibra-Tech
bought, or was flat out false.  (Trial Trans. (S. Kavalek)
1/31/2012, 145:6 - 198:17; 2/1/2012, 15:22 - 38:1).

Shamany conducted a termination interview of Scott Kavalek at the
Mt. Holly office.  Scott Kavalek was interviewed and falsely
denied that either he or his wife, Roberta Kavalek, had any
affiliation with IGS.  He denied having any knowledge about the
existence of IGS or its operations.  (Trial Trans. (S. Kavalek)
1/17/2012, 93:18 - 93-24;  Trial Trans. (S. Shamany) 1/19/2012,
91:1 - 95:22).

93.  Regarding Geotech, he stated that Geotech was Roberta
Kavalek's company, but acknowledged that he had a 49% ownership
interest in Geotech.  He claimed that he only performed website
and consulting work on behalf of Geotech.  He admitted that he
had never told anyone at Vibra-Tech about his relationship with
Geotech.  (Trial Trans. (S. Shamany) 1/19/2012, 91:1 - 94:7).

**G. Evidence Tampering**

94.  Vibra-Tech uncovered a discrepancy between the IGS
invoices produced by the Kavalek Defendants and corresponding IGS
invoices obtained by subpoena from IGS's customers. Specifically,
the Kavaleks produced copies of invoices to IGS's customers in
discovery that listed "RK" (Roberta Kavalek) as the "Sales Rep"
for Kline Engineering and Newmark Engineering.  Vibra-Tech later
obtained copies of the same invoices via subpoena from IGS's
customers that listed "SJK" (Scott Kavalek) as the sales
representative for the very same IGS equipment and services.  The
Kavalek Defendants had produced comparable copies of invoices

45

with the same identifying number, date, customer, product and
price.  The only difference between the IGS invoices produced by
the customers and those produced by the Kavalek Defendants is
that the former showed "SJK" (Scott Kavalek) as the assigned
"Sales Rep" for the IGS customer and the latter showed "RK"
(Roberta Kavalek).  (Trial Trans. (B. Lindenberg) 1/24/2012,
103:13 - 115:23; P-34: P-35: P-36; P-37; P-38; P-38A - 38H; P-39;
P-39A - 39L; P-40; P-40A - 40I; P-41; P-41A - 41C; P-42).

    95.  Vibra-Tech's review of the QuickBooks accounting files of
IGS revealed a blatant, repetitive and extensive pattern of
tampering with evidence.  The QuickBooks program has a feature
known as "Audit Trail."  The Audit Trail report lists each
accounting transaction and any additions, deletions or
modifications that affect that transaction.  Audit Trail reports
introduced at trial demonstrated substantive alterations to the
QuickBooks data for invoices issued by IGS to three of its
largest customers, Kline Engineering, McLaren Engineering, and
Newmark Engineering. (P-31; Trial Trans. (B. Lindenberg)
1/24/2012, 116:1 - 126:21).

    96.  Exhibit P-31, page 13, is a portion of the Audit Trial
report relating to IGS invoice # 612091, dated December 16, 2006.
It demonstrates that the invoice was from IGS to Kline
Engineering for $4575 and the "Rep" for the account was initially
recorded as "Scott J. Kavalek."  The report shows that the

46

initial data for the invoice was entered in QuickBooks on January 20, 2007.  It was subsequently modified on November 9, 2008 at 16:33 (4:33 p.m.).  The only change made at that time was to change the designated "Rep" from "Scott J. Kavalek" to "Robbi Kavalek."  Roberta Kavalek made both the initial entries and the changes in the "Rep" data. (Trial Trans. (B. Lindenberg) 1/24/2012, 120:1 - 123:11; P-31 at 12-13).

97.  This and many other changes were made on the day before the documents were produced to Vibra-Tech's counsel in discovery. (Trial Trans. (B. Lindenberg) 1/24/2012, 125:16 - 125:24; Trial Trans. (R. Kavalek) 1/26/2012, 13:5 - 13:14; P-31).  Roberta Kavalek admitted that she noticed the "Rep" field issue when she was using the software to print the records to give to her attorney for the purpose of responding to discovery requests. (P-504 1/8/2010 (Deposition of R. Kavalek) at 6:2 - 6:22).  She repeated this process every time she noticed Scott Kavalek's name in the "Rep" field when she was printing documents for discovery purposes.  (P-504 1/8/2010 (Deposition of R. Kavalek) at 7:7 - 7:17).

98.  Both Kavaleks were questioned in their depositions about gaps in their document productions. Until they were confronted with the discrepancies between the Kline, Newmark, and McLaren invoices and forced to produce their QuickBooks files, they lied repeatedly in their depositions and affidavits and continued to

cover-up the actions they had taken. (P-26 Stipulation Concerning Evidence Tampering ¶(1)(C)).

99.   In affidavits submitted by both Kavaleks, they made numerous false statements regarding their efforts to produce records requested in discovery.  (P-28; P-29; P-32; P-33; P-34; P-35; P-36; P-504 1/8/2010 (Deposition of R. Kavalek) at 33:11 - 35:19; P-507 1/8/2010 (Deposition of S. Kavalek) at 4:15 - 19:9, 26:8 - 28:15).  Scott Kavalek falsely claimed that IGS records were lost in computer crash, when, in fact, he had created a backup of the records which he knew existed.  (P-504 1/8/2010 (Deposition of R. Kavalek) at 16:17 - 24:18; P-507 1/8/2010 (Deposition of S. Kavalek) at 4:15 - 19:9).  Scott Kavalek purposefully did not examine the backup for the purposes of document productions in this case out of fear of what the records might demonstrate.  (P-507 1/8/2010 (Deposition of S. Kavalek) at 24:20 - 25:5). Scott Kavalek also deleted IGS records from a computer server the day after he was served with the Complaint in this action out of fear of what the records might demonstrate. (P-507 1/8/2010 (Deposition of S. Kavalek) at 17:18 - 19:9).

100. As a result of their deceitful actions, the Kavaleks caused their own counsel to make repeated false representations to Magistrate Judge Donio in a series of hearings on motions to compel discovery in which Vibra-Tech sought documents concerning Scott Kavalek's involvement with IGS and its customers.  (P-26

48

Stipulation Concerning Evidence Tampering ¶(1)(C)).  Perhaps the most repeated representation of counsel on the Kavaleks' behalf was that Scott Kavalek had performed no services and had no involvement with any of the customers of IGS or with the management of that corporation.  This was made on several occasions on the record and on each occasion, both Kavaleks were seated in the courtroom.  For example, on June 26, 2008, during a discovery hearing with the court, counsel to the Kavalek Defendants stated that "IGS is in a business that does do some competition with Vibra-Tech.  Mr. Kavalek has absolutely no relationship to IGS."  (Trans. of Discovery Conference before Judge Donio, 6/26/2008, 6:19 - 6:21).

101. As a result of these events, Scott Kavalek, Roberta Kavalek, IGS and Geotech all stipulated that:

1.  The following facts are established for all purposes in this action:

A. Scott Kavalek and Roberta Kavalek, acting on behalf of themselves and on behalf of defendants Integrated Geotechnical Solutions, Inc. ("IGS") and Geotech Instruments, Inc. ("Geotech")(collectively, the "Kavalek Defendants"), knowingly and purposefully changed, manipulated, tampered with and withheld evidence that was contrary to the factual and legal contentions they have advanced in this action;

B.  In so doing, Scott Kavalek and Roberta Kavalek acted with the intent and purpose to deceive both the court and the other parties to this action; and

49

> C.    After performing the acts of tampering,
> Scott Kavalek and Roberta Kavalek then engaged
> in a series of acts to conceal and cover up
> the actions they had taken. These included
> giving false deposition testimony, filing and
> supplying false affidavits and declarations
> under oath, and causing their counsel to make
> a series of false representations to the
> court, most of which were made in the
> Kavaleks' presence.

2. Evidence of the actions of the Kavalek Defendants as
summarized in the preceding paragraph is admissible at the
trial of this action and may be considered by the court as
proof in the plaintiff's case-in-chief and as evidence
relevant to the veracity of the testimony of Scott Kavalek and
Roberta Kavalek.

3. At trial, the court shall draw an inference from the
aforesaid evidence that the Kavalek Defendants changed,
manipulated, tampered with and withheld evidence based on the
well-founded conclusion that the evidence so suppressed would
tend to prove the merits of plaintiff's claims against them.

(P-26).

102. Despite the existence of this stipulation, during her

testimony, Roberta Kavalek attempted to disown the stipulation by

claiming that she did not intend to deceive the Court by editing

the QuickBooks files.  (Trial Trans. (R. Kavalek) 1/26/2012, 79:3

- 87:3).

103. In light of this stipulation, in instances where

credibility was an issue or where there were competing inferences

that could have been drawn, the Court drew an inference favorable

to Vibra-Tech.

**H. Damages**

104.   As a result of the actions of Defendants Scott and Roberta Kavalek, on behalf of and in concert with Geotech and IGS, Vibra-Tech has suffered economic damages of $1,296,120 under a lost profits methodology and $1,961,019 under a disgorgement methodology.  (P-10; P-12).

**a.    IGS-related Damages**

105. Vibra-Tech customers who became IGS customers, either while Scott Kavalek was still employed by Vibra-Tech or during the two-year non-competition period after the termination of Scott Kavalek's employment, through May of 2010, included:

    a.   The Atlantic Yards Development Co., LLC

    b.   Cutrupi & Company

    c.   Kline Engineering, P.C.

    d.   Langan Engineering & Environmental Services

    e.   McLaren Engineering, P.C.

    f.   Newmark Engineering, P.C.

    g.   Quality Control Laboratories, LLC

    h.   Site - Blauvent Engineers, and

    i.   Turner Construction Company

(Trial Trans. (J. Stavros) 1/23/2012, 75:18 - 78:1, 92:15 - 94:11; P-10; P-12 at 6a; P-55).

106. IGS sales to the former Vibra-Tech customers who became IGS customers totaled $1,526,359 during the calendar years 2005

51

through 2009. (Trial Trans. (J. Stavros) 1/23/2012, 75:18 - 78:1, 92:15 - 94:11; P-10; P-12 at 6a; P-55).

107. A potential Vibra-Tech customer is a customer who was never a Vibra-Tech customer, but became an IGS customer while Scott Kavalek was still employed by Vibra-Tech. (Trial Trans. (J. Stavros) 1/23/2012, 79:2 - 80:13). Given the plethora of evidence which confirms that Scott Kavalek played the primary role in soliciting clients for IGS, it is appropriate to conclude that had he fulfilled his duties to Vibra-Tech, instead of diverting potential customers to IGS, those potential customers would have become Vibra-Tech customers.

108. Potential Vibra-Tech customers who became IGS customers, either while Scott Kavalek was still employed by Vibra-Tech or during the two-year non-competition period after the termination of Scott Kavalek's employment, through the end of 2009, included:

　　a.　　11-01 43rd Avenue, LLC

　　b.　　281 Broadway Holdings, LLC

　　c.　　A-1 Testing

　　d.　　BTA Building & Development

　　e.　　Extell West 57th, LLC

　　f.　　Gladden Properties, LLC

　　g.　　Mueser Rutledge Consulting Engineers

　　h.　　Risk Reduction Resources, Inc.

　　i.　　Shen Milsom & Wilke, Inc.

> j.    TRC Environment Corp.

> k.    Vanderweil Engineers

> l.    Velocity at Greystone, LLC

(Trial Trans. (J. Stavros) 1/23/2012, 79:2 - 80:13; P-12 at 6a).

109. IGS sales to the Potential Vibra-Tech Customers who became IGS customers totaled $874,232 between 2006 and 2009. (Trial Trans. (J. Stavros) 1/23/2012, 79:2 - 80:13; P-12 at 6a).

110. Based on the sales figures expressed above, multiplied by a reasonable calculation of Vibra-Tech's incremental gross profit margin for the years in question, Vibra-Tech's damages due to the IGS scheme under a lost profits methodology were $976,217. Prejudgment interest through January 11, 2012, applied in accordance with New Jersey R. 4:42-11, totals $88,013, for a subtotal of $1,064,230.[12]  Based on the IGS sales figures available, it is reasonable to assume that sales conducted from the beginning of 2010, through May of 2010, the end of Scott Kavalek's two year non-competition period, would have resulted in

---

[12]  Prejudgment interest in New Jersey is governed by Rule 4:42-11.  This rule requires application of an interest rate equaling the "average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund (State accounts) as reported by the Division of Investment in the Department of the Treasury," plus 2%. Application of prejudgment interest by Vibra-Tech's accounting expert was proper.

$82,560 in additional lost Vibra-Tech profits.[13] (Trial Trans.
(J. Stavros) 1/23/2012, 84:20 - 92:14, 94:12 - 94:23; P-12 at 2a,
6a).

111. After accounting for projected lost profits during 2010,
total Vibra-Tech damages due to IGS under a lost profits measure
of damages are $1,146,790.  (Trial Trans. (J. Stavros) 1/23/2012,
84:20 - 92:14, 94:12 - 94:23; P-12 at 2a, 6a).

112. Under a disgorgement theory, IGS's net taxable income
through the end of 2009, $1,221,785, is added to Scott and
Roberta Kavalek's IGS wages (less a reasonable salary for the
work they provided to IGS), for a total of $1,419,765.
Prejudgment interest through January 11, 2012, applied in
accordance with New Jersey R. 4:42-11, totals $140,913, for a
subtotal of $1,560,678.  Based on the IGS sales figures
available, it is reasonable to assume that IGS net income for the
first five months of 2010, the end of Scott Kavalek's two-year
non-competition period, would have resulted in $115,985 in

---

[13]  Although Vibra-Tech asked Defendants for 2010 sales
data, IGS sales figures for the first five months of 2010 were
not made available to Plaintiff.  Consequently, Plaintiff
estimated IGS sales based on its previous sales figures.  This is
reasonable considering that past experience of an ongoing
business provides a reasonable basis for the computation of lost
profits.

additional IGS net income.[14] (Trial Trans. (J. Stavros)
1/23/2012, 94:25 - 97:12; P-12 at 2a, 6a).

113. After applying prejudgment interest on the projected net
income during the first five months of 2010 in the amount of
$355, total Vibra-Tech damages due to IGS under a disgorgement
measure of damages are $1,677,018. (Trial Trans. (J. Stavros)
1/23/2012, 94:25 - 97:12; P-12 at 2a, 6a).

114. Scott Kavalek, Roberta Kavalek and IGS acted with
knowledge and intent and in concert to bring about the damages
described *supra*.

**b.   Geotech-Related Damages**

115. Under a lost profits theory, Geotech's net profits on
sales to Vibra-Tech totaled $116,072.  Prejudgment interest,
applied in accordance with New Jersey R. 4:42-11, totals $16,297,
for a subtotal of $132,369.  (Trial Trans. (J. Stavros)
1/23/2012, 40:9 - 48:5; P-12 at 3a).

116. Vibra-Tech's damages due to Geotech's fraudulent sale of
tilt beams to Vibra-Tech is $15,375.  Prejudgment interest,
applied in accordance with New Jersey R. 4:42-11, totals $1,587,
for a subtotal of $16,962.  (Trial Trans. (J. Stavros) 1/23/2012,
44:11 - 47:4; P-12 at 3a).

117.  Total damages suffered by Vibra-Tech as a result of the
Geotech scheme under a lost profits measure of damages is

---

[14]   *See supra* note 13.

$149,331.  (Trial Trans. (J. Stavros) 1/23/2012, 40:9 - 48:5; P-12 at 3a).

118. Under a disgorgement theory, the total of all Geotech net taxable income, including profits from sales to companies other than Vibra-Tech, less a reasonable wage for Scott and Roberta Kavalek is $239,827.  Prejudgment interest through January 11, 2012, applied in accordance with New Jersey R. 4:42-11, totals $27,567, for a subtotal of $267,394.  (Trial Trans. (J. Stavros) 1/23/2012, 48:6 - 71:5; P-12 at 3a).  After including the $16,962 for the fraudulent sale of tilt beams (*see supra* ¶ 116), total Vibra-Tech damages due to Geotech under a disgorgement measure of damages is $284,356. (Trial Trans. (J. Stavros) 1/23/2012, 48:6 - 71:5, 74:7 - 74:20; P-12 at 3a).

119. Pursuant to N.J.S.A. § 56:8-19, damages related to the Geotech scheme are trebled.  Threefold damages of Vibra-Tech's lost profits due to purchases made from Geotech ($149,331) is $447,993.

120. Scott Kavalek, Roberta Kavalek and Geotech acted with knowledge and intent and in concert to bring about the damages described *supra*.

### III. Conclusions of Law

### A.  Breach of Fiduciary Duty (Count One)

In New Jersey, an employee owes his employer a fiduciary duty of loyalty, which "consists of certain very basic and common

sense obligations.  An employee must not while employed act contrary to the employer's interest." *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 301 (2001).  During a period of employment, an employee has a duty not to compete with his or her employer.  *Id.*; *see also Cameco v. Gedicke*, 157 N.J. 504, 517 (1999).

An employee may breach the duty of loyalty by actions that do not rise to the level of direct competition.  Merely acting contrary to the employer's interests constitutes a breach of the duty of loyalty.  *Cameco*, 157 N.J. at 517.  For example, employees can breach the duty of loyalty by engaging in self-dealing or by taking or using legally protected information to benefit himself.  *Id.; Lamorte*, 167 N.J. at 304.

Scott and Roberta Kavalek, both individually and acting through IGS and Geotech, have breached the fiduciary duties each owed to Vibra-Tech.  Their actions caused Vibra-Tech to purchase equipment from Geotech without knowing that Geotech was owned and operated by the Kavaleks.  By incorporating IGS and Geotech during their employment and using their positions at Vibra-Tech to further their own business interests, the Kavalek Defendants blatantly took profits away from Vibra-Tech and put them into their own pockets.  Both Scott and Roberta Kavalek went so far as to use Vibra-Tech's own equipment to further their own competing interests.  Moreover, as an officer and director of Vibra-Tech,

Scott Kavalek – both alone and with the other Defendants – competed directly with Vibra-Tech during the course of his employment and failed to further the business efforts of Vibra-Tech by neglecting his duties, which is a violation of his obligation of due care, good faith and loyalty.

IGS and Geotech aided and abetted and acted in concert with Scott and Roberta Kavalek in breaching the fiduciary duties each owed to Vibra-Tech. Moreover, after she left Vibra-Tech's employ, Roberta Kavalek aided and abetted and acted in concert with Scott Kavalek in breaching the fiduciary duties he owed to Vibra-Tech.

Any information known to or possessed by the Kavaleks is imputed to IGS and Geotech. *NCP Litigation Trust v. KPMG LLP*, 187 N.J. 353, 366-367 (2006)(citations omitted). Further, an individual who owes a fiduciary duty to a third party cannot use a corporation he owns as the vehicle to accomplish a breach of that duty and then claim that the corporation is not equally liable. *Cameco*, 299 N.J. Super. at 207-208. It is well-settled in New Jersey that one who provides assistance to an agent to further the agent's breach of duty may be held liable to the principal. *Hirsch v. Schwartz*, 87 N.J. Super. 382 (App. Div. 1965); *see also Franklin Medical Associates v.Newark Public Schools*, 362 N.J. Super. 494 (App. Div. 2003)(doctors who bribed an agent of Newark's workers' compensation division "aided and

58

abetted" the agent in the breach of the agent's fiduciary duty of loyalty to Newark, and as such, Newark without demonstrating an actual loss, was permitted to recover damages from the doctors); *Township of Wayne v. Messercola*, 789 F.Supp. 1305 (D.N.J. 1992)(attorney who was jointly liable as aider and abettor to breach of fiduciary duty relating to scheme by real estate developer to bribe mayor was liable for full amount of bribe paid by developer, even though mayor only received portion of bribe).

   Geotech is liable for its actions in aiding Scott and Roberta Kavalek in breaching the fiduciary duties they owed to Vibra-Tech.  The facts are clear that Geotech was a corporation created and operated directly by the Kavaleks to supply equipment to Vibra-Tech and to assist IGS in its unlawful activities. Geotech had the advantage of knowing what prices Vibra-Tech paid for equipment from Geotech's own competitors, by and through its corporate agents, the Kavaleks.  This knowledge of Vibra-Tech's purchasing abilities placed Vibra-Tech in an unequal bargaining position with Geotech.

   IGS is liable for its actions in aiding Scott and Roberta Kavalek in breaching the fiduciary duties they owed to Vibra-Tech.  IGS is a corporation created and operated by Roberta Kavalek for the express purpose of competing directly with Vibra-Tech.  While employed by Vibra-Tech, Scott and Roberta Kavalek represented to customers seeking to do business with

59

Vibra-Tech that IGS could offer the same services. IGS ultimately secured business that should have gone to Vibra-Tech. The success of IGS was also aided by its ability to utilize the equipment of Vibra-Tech which was obtained improperly by the Kavaleks. IGS also benefitted from the training and knowledge secured by the Kavaleks during their employment with Vibra-Tech. The corporate identities of IGS and Geotech permitted the Kavaleks to further their scheme to defraud Vibra-Tech by hiding their true involvement from Vibra-Tech.

**B. Breach of Employment Agreements (Counts Two and Three)**

Scott and Roberta Kavalek breached their employment agreements. Foremost, Scott and Roberta Kavalek operated the competing entities IGS and Geotech simultaneously while employed at Vibra-Tech. This is a direct violation of paragraph 2 of both Kavaleks' employment agreements which prohibit any employment other than with Vibra-Tech without notice to Vibra-Tech. Knowing their actions violated their employment agreements, the Kavaleks deliberately concealed their competing businesses from Vibra-Tech.

Scott Kavalek used Vibra-Tech's client information to the detriment of Vibra-Tech's economic advantage. Further, Scott and Roberta Kavalek misappropriated Vibra-Tech's confidential client information to secure business for IGS and Geotech. Their misuse of Vibra-Tech's information is in direct violation of the

Employment Agreement paragraphs protecting Vibra-Tech's confidential information.  For Scott Kavalek, this includes paragraph 5, which prohibits disclosing any "secret process, trade secret or other confidential information or information relating to business" and for Roberta Kavalek, paragraph 6 which prohibits her from disclosing Vibra-Tech confidential information to others.  By using confidential information in her work on behalf of IGS, Roberta Kavalek "disclosed" this information to a competitor.

By assisting in the operation of IGS after the termination of his employment with Vibra-Tech, Scott Kavalek violated paragraph 6 of his Employment Agreement, which provides for a two year non-competition period.  The contract states clearly that this provision applies regardless of whether the termination was caused by the employer or the employee.

Under Pennsylvania law, covenants in an Employment Agreement are enforceable at law (i.e. claims for money damages) so long as the covenants are not unconscionable or otherwise defective.  *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 n.5 (3d Cir. 2007) (citing *Krauss v. M.L. Claster & Sons, Inc.*, 434 Pa. 403, 254 A.2d 1, 3 (1969)); *see also Boyce v. Smith-Edwards-Dunlap Co.*, 580 A.2d 1382, 1388 (Pa. Super. Ct. 1990)(applying rationale of *Krauss* to affirmative claim by employer against employee).  Since Vibra-Tech seeks only enforcement at law, and the restrictive

61

covenants in the Employment Agreements are not unconscionable or otherwise defective, the Court holds that they are valid and enforceable.

## C.  Tortious Interference with Prospective Economic Advantage (Count Four)

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation, free from undue influence or molestation." *Lamorte*, 167 N.J. at 305.  To prove such a claim, plaintiff must show that there was a "reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious interference, and that it suffered losses thereby." *Id.* at 305-06.  "[W]here there is proof that if there had been no interference there was a reasonable probability that [plaintiff] would have received the anticipated economic benefit" then causation is satisfied.  *Id.* at 306.  In this context, malice means that the "harm was inflicted intentionally and without justification or excuse."  *Id.*

Vibra-Tech's expectation of economic advantage in keeping its former clients, which were diverted to IGS by the Kavaleks, was a reasonable expectation.  Vibra-Tech has demonstrated that it built strong relationships with its clients and that those customers would have continued working with Vibra-Tech but for the actions of the Kavalek Defendants.

Vibra-Tech has also demonstrated that it had a reasonable expectation of economic advantage in obtaining customers that became IGS clients, but were never Vibra-Tech clients.  The fact that Scott Kavalek was able to solicit them on behalf of IGS is direct evidence of Vibra-Tech's reasonable expectation of doing the same.  After all, Scott Kavalek, under the terms of his Employment Agreement, should have been making the same solicitations on behalf of Vibra-Tech.  As Area Manager, Scott Kavalek decided what customers to solicit in his area and was therefore in a position to prevent Vibra-Tech from soliciting certain new clients.  Since it was part of Scott Kavalek's job to solicit new clients for Vibra-Tech and since he instead solicited those clients for IGS, it is reasonable to conclude that, but for Scott Kavalek's wrongful actions in soliciting clients for his competing business, these potential clients would have been Vibra-Tech clients.

As to the former Vibra-Tech clients who became IGS clients, it is apparent from the evidence presented that the Kavaleks' actions were the principal reason that these clients left Vibra-Tech.  Since the clients in question dealt with Scott Kavalek directly, this diversion of clients was sometimes as simple as Scott Kavalek telling the client that he was with IGS.

Vibra-Tech's reasonable expectations of maintaining its business relationships with existing clients and establishing

63

business relations with new clients that were instead obtained by
IGS were frustrated by the Kavaleks' concerted conduct.

Scott and Roberta Kavaleks' conduct was clearly malicious in
the sense that their conduct was intentional and without
justification.  The Kavaleks were gainfully employed by
Vibra-Tech.  For no reason other than personal profit, they
decided to take advantage of their employer to benefit
themselves.

**D.  Tortious Interference with Existing Business Relationships
(Count Five)**

New Jersey courts do not draw a distinct line between actions
for tortious interference with prospective economic advantage and
for tortious interference with existing business relationships.
*See Singer v. Beach Trading Co., Inc.*, 379 N.J. Super. 63, 81
(App. Div. 2005); *see also Carpet Group Intern v. Oriental Rug
Importers Ass'n Inc.*, 256 F.Supp. 2d 249, 288 (D.N.J. 2003)("The
requirements of each claim are identical except that the tortious
interference with contractual relations claim requires proof of
an existing contract.").

The Kavaleks, IGS and Geotech interfered with Vibra-Tech's
existing business relationships by usurping numerous corporate
opportunities. For example, Vibra-Tech had already been engaged
to do the first phases of work on the Atlantic Yards complex in
Brooklyn by the Atlantic Yards Development Company.  Vibra-Tech

64

expected this to include the provision of seismographs and related equipment for the vibration monitoring phase of the project. Without disclosing in any respect his relationship with IGS, Scott Kavalek negotiated an arrangement whereby Vibra-Tech would perform the servicing on the job, but IGS would supply the equipment. In 2007 alone, IGS had gross receipts of $246,500 from this job, while Vibra-Tech had $244,652. All of this occurred while Scott Kavalek was still employed as Vibra-Tech's Area Manager in the region.

**E.  Tortious Interference with the Bauman Employment Agreement (Count Twelve)**

As discussed *supra*, a cause of action for tortious interference with contractual relations exists when (1) there is an existing contract, (2) it is maliciously interfered with, and (3) the interference causes damages to the plaintiff.  "Malice" here means only that the action was intentional and unjustified.

Vibra-Tech had an employment agreement with Charles Bauman, which contained restrictive covenants that were identical to those contained in Scott Kavalek's employment agreement.  Scott and Roberta Kavalek and IGS were well aware of the existence and terms of the Bauman employment agreement because Roberta Kavalek witnessed the signing of the agreement and Scott Kavalek signed it on behalf of Vibra-Tech.  Yet, while Charles Bauman was still employed by Vibra-Tech, the Kavaleks induced him to work secretly

65

for IGS, in direct violation of the restrictive covenants in his employment agreement as well as his common law duties to Vibra-Tech.  Eventually, they convinced him to terminate his employment with Vibra-Tech so that he could work solely for IGS.

As a direct result of the Kavaleks' actions, and those of IGS, Vibra-Tech suffered the loss of an employee who, but for the Kavalek Defendants' actions, would likely have continued his employment with Vibra-Tech.  Furthermore, Bauman accepted employment with a direct competitor of Vibra-Tech and assisted that competitor, working on projects for several former Vibra-Tech clients.  As such, the Kavaleks and IGS are liable for tortious interference with the Bauman Employment Agreement.[15]

## F.  Conversion (Count Six)

"The tort of conversion is the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights."  *Advanced Enterprises Recycling, Inc. v. Bercaw*, 376 N.J. Super. 153, 161 (App Div. 2005).

The Kavalek Defendants converted Vibra-Tech monitoring equipment, without Vibra-Tech's permission, for their own use on

_____

[15]  While the Court agrees with Vibra-Tech that the Kavalek Defendants' tortious interference with the Bauman Employment Agreement has redounded to the benefit of IGS, to the extent that taking Bauman away from Vibra-Tech increased IGS's profits, this financial benefit is included in the disgorgement damages.  *See infra* section IV.  Therefore, the Court will not award additional damages stemming from this claim.

certain IGS jobs.  Roberta Kavalek also converted the laptop issued to her by Vibra-Tech for her use in securing business for IGS and Geotech, in particular from former Vibra-Tech customers Kline Engineering and McLaren Engineering.  The Vibra-Tech computer was also converted for Defendants' use on an IGS monitoring project in Yonkers, New York.

**G.  Civil Conspiracy (Count Seven)**

A civil conspiracy is a "combination of two or more persons acting in concert to commit an unlawful act . . . the principal element of which is an agreement between the parties" to injure another and an overt act that results in damage.  *Morgan v. Union Cty Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (App. Div. 1993)(internal quotations and citation omitted).  The essence of the claim is not the agreement but the underlying wrong which would give rise to a cause of action.  *Id.* (citing *Bd. of Ed. v. Hoek*, 28 N.J. 213, 238 (1962).  To establish conspiracy, it must be established that the alleged conspirators understood the general objectives of the conspiracy, accepted them and made an implicit or explicit agreement to further those objectives.  *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005).

The Geotech and IGS schemes, which were orchestrated jointly by Scott and Roberta Kavalek, were the product of an agreement among the Kavaleks and the two corporations to commit unlawful

acts.  The unlawful acts included the breach of the fiduciary duties that the Kavaleks' owed to Vibra-Tech, the breach of their employment agreements, tortious interference, common law fraud and consumer fraud.  The complexity and forethought required for the Kavaleks' overt acts in furtherance of their plan – the incorporation of IGS and Geotech, the concealment of the corporations' activities, the use of Vibra-Tech equipment on IGS jobs, and the day-to-day operation of the businesses, to name a few – demonstrate that there could have been no action absent an agreement among the four.  Therefore, the Kavaleks and their companies engaged in a civil conspiracy and will be held jointly liable for the acts in furtherance of the conspiracy.

## H.  Unjust enrichment (Count Eight)

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).

The Kavalek Defendants received numerous benefits from their schemes, the retention of which without providing compensation to Vibra-Tech would be unjust.  They received Vibra-Tech's confidential business information, which they used to operate a competing business.  They used Vibra-Tech's equipment and software for the purpose of operating their competing business. They received payment for items sold by Geotech to Vibra-Tech,

when Vibra-Tech was unaware that Geotech involved a scheme to
provide kickbacks to the Kavalek Defendants without providing any
value to Vibra-Tech.  They received wages and other benefits from
Vibra-Tech while clearly devoting their efforts to IGS and
Geotech.

## I.  Common law fraud (Count Nine)

The five elements of common law fraud are: (1) a material
misrepresentation of a presently existing or past fact; (2)
knowledge or belief by the defendant of its falsity; (3) an
intention that plaintiff rely on it; (4) reasonable reliance by
plaintiff; and (5) resulting damages.  *Liberty Mut. Ins. Co. v.
Land,* 186 N.J. 163, 175 (2006).  While classic common law fraud
requires a representation, silence "in the face of a duty to
disclose [] may be a fraudulent concealment." *Berman v. Gurwicz*,
189 N.J. Super 89, 93 (Ch. Div. 1981), *aff'd*, 189 N.J. Super 49
(App. Div. 1983).

Regarding the Geotech scheme, the Kavaleks represented to
Vibra-Tech that it was necessary for Vibra-Tech to purchase
equipment from Geotech, which was demonstrably untrue.  The
Kavaleks, as founders of Geotech and employees of Vibra-Tech, had
every ability to do for Vibra-Tech what they had done for Geotech
in terms of purchasing equipment directly from manufacturers.
Roberta Kavalek then prepared and submitted invoices to
Vibra-Tech on behalf of Geotech.  There is no doubt that the

Kavaleks knew that these statements were false and that they knew
the statements would induce Vibra-Tech to purchase equipment from
Geotech unnecessarily, and at a much higher cost than could be
had otherwise.  Significantly, the Kavaleks failed to notify
Vibra-Tech about their ownership interest in Geotech.  Vibra-Tech
suffered damages from the Defendants' fraudulent actions by
overpaying for equipment purchased from Geotech.

   Both Scott and Roberta Kavalek acted, on behalf of themselves
and of Geotech, with intent (1) to defraud Vibra-Tech, (2) to
induce Vibra-Tech to purchase equipment at a higher price than
was necessary, and (3) to cause injury to Vibra-Tech.  Due to the
Kavaleks' internal positions within Vibra-Tech and their
knowledge of Vibra-Tech's purchasing practices, there was a
substantial certainty that their fraudulent conduct would cause
injury to Vibra-Tech.

   As to the IGS scheme, both a fiduciary relationship and a
contractual relationship existed between each individual
Defendant and Vibra-Tech.  *See supra*, Part III.A.  This fiduciary
relationship created an affirmative duty for the individual
Defendants to disclose their relationship with IGS to their
principal.  The Kavaleks both failed to disclose these
relationships to Vibra-Tech.  They clearly intended for
Vibra-Tech to rely on this lack of disclosure, and took many
affirmative steps to ensure that Vibra-Tech's management would

not learn of their arrangement. Vibra-Tech demonstrably relied on this failure to disclose.  Vibra-Tech was damaged directly to the extent of the losses of revenue caused by the diversions of business achieved by the Kavaleks.  Vibra-Tech also was damaged to the extent that Scott Kavalek's continued employment allowed him to use Vibra-Tech's property and confidential business information to benefit IGS.

Regarding the IGS scheme, both Scott and Roberta Kavalek acted, on behalf of themselves and of IGS, with intent (1) to defraud Vibra-Tech, (2) to induce Vibra-Tech to rely on their representations and their respective failures to disclose their relationship with IGS, and (3) to cause injury to Vibra-Tech. Due to the Kavaleks' internal positions within Vibra-Tech, and their knowledge of Vibra-Tech's operations, pricing, and clients, there was a substantial certainty that their fraudulent conduct would cause injury to Vibra-Tech.

## J.  New Jersey Consumer Fraud Act (Count Thirteen)

The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 et seq., prohibits among other things, fraud in connection with the sale or advertisement of merchandise.  To make out a Consumer Fraud Act claim, plaintiff must demonstrate (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of plaintiff; and (3) a causal connection between the defendants' unlawful conduct and the plaintiff's ascertainable loss.  *Int'l Union of*

*Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.,*
Inc., 192 N.J. 372, 389 (2007).

   The Consumer Fraud Act declares unlawful the "act, use or
employment by any person of any unconscionable commercial
practice, deception, fraud, false pretense, false promise,
misrepresentation, or the knowing, concealment, suppression, or
omission of any material fact with intent that others rely upon
such concealment, suppression or omission, in connection with the
sale ... of any merchandise." N.J.S.A. § 56:8-2.   Unlawful
conduct under the Consumer Fraud Act can consist of affirmative
acts or acts of omission.   *Ji v. Palmer*, 333 N.J. Super. 451, 461
(App. Div. 2000).

   Scott and Roberta Kavalek purposefully failed to disclose to
Vibra-Tech that they were the owners and employees of Geotech in
an effort to increase their own profits.   From February 2006 to
April 2008, Scott Kavalek, through his position as Vibra-Tech's
Area Manager, caused Vibra-Tech to purchase equipment from
Geotech.   Scott Kavalek misused his authority as Area Manager to
demand and authorize purchases from Geotech.   Roberta Kavalek
issued the invoices to Vibra-Tech on behalf of Geotech.   Before
Vibra-Tech discovered that the Kavaleks were actually the owners
and operators of Geotech, the Kavaleks had caused Vibra-Tech to
purchase more than $279,000 in equipment from Geotech.   During

this time period, Geotech experienced annual gross "profit" margins ranging from 37.72% to 67.11%.

In April of 2008, Defendants Geotech and Scott and Roberta Kavalek submitted a Geotech invoice to Vibra-Tech, which included a charge for $15,375 for 25 ELS Horizontal Tilt Beams, which Scott Kavalek claimed were necessary for a particular job. Vibra-Tech paid the invoice in full.  Geotech did not in fact purchase any tilt beams to be delivered to Vibra-Tech.  Instead, the Kavalek Defendants used tilt beams that Vibra-Tech had already purchased for a job that was conducted in 2003 and that the Defendants had purloined when the job was completed.

Scott and Roberta Kavalek and Geotech acted with intent (1) to defraud Vibra-Tech, (2) to induce Vibra-Tech to purchase equipment at a higher price than was necessary, and (3) to cause injury to Vibra-Tech.  Due to the Kavaleks' internal positions within Vibra-Tech and their knowledge of Vibra-Tech's purchasing practices, they acted with a substantial certainty that their fraudulent conduct would cause injury to Vibra-Tech.

Vibra-Tech suffered an ascertainable loss in that it paid unnecessary sums to Geotech for items which it could have purchased on its own, all due to the misrepresentations of Geotech and its owners and operators, Scott and Roberta Kavalek. In addition to these purchases, the Kavalek Defendants induced Vibra-Tech to pay $15,375 in exchange for "new" tilt beams that

73

Vibra-Tech already owned and had used on an earlier job.  The
Kavaleks' failure to disclose their relationship with Geotech to
Vibra-Tech, the delivery of an invoice for new tilt beams which
were never provided, the acceptance of payment for new tilt beams
never provided, and statements related to the necessity of
purchasing equipment from Vibra-Tech, were the direct causes of
Vibra-Tech's ascertainable loss.  It is apparent that Vibra-Tech
would never have purchased these items on these terms, nor would
it have paid for new tilt beams that were never delivered absent
the fraudulent conduct at issue.  Based on the above, the
Kavaleks' and Geotech's conduct was an unlawful practice under
the Consumer Fraud Act.

## IV. Damages

### A.  Theories of Recovery

There are two theories of recovery applicable to this case:
lost profits and disgorgement.

Recovery of profits lost due to the illegal acts of the
Kavalek Defendants is available for claims of breach of contract
(Counts 2 and 3), breach of fiduciary duty (Count 1), tortious
interference (Counts 4, 5, and 12), and common-law fraud (Count
9). *RSB Lab. Servs., Inc. v. BSI, Corp.*, 368 N.J. Super. 540,
555-56 (App. Div. 2004) (quoting *Pickett v. Lloyd's*, 131 N.J.
457, 474 (1993)) (breach of contract); *Cameco*, 157 N.J. at 518
(breach of fiduciary duty); *Lightning Lube, Inc. v. Witco Corp.*,

74

4 F.3d 1153, 1177 (3d Cir. 1993) (applying New Jersey law)
(tortious interference); *see also* Restatement (Second) of Torts,
§ 774A(1)(a)-(b) (1979) (tortious interference); *McConkey v. AON
Corp.*, 354 N.J. Super. 25, 53 (App. Div. 2002) (common-law
fraud).

In the context of a breach of contract action in New Jersey,
it has long been established that a party who breaches a contract
"is liable for all of the natural and probable consequences of
the breach of that contract," including lost profits to the
extent such profits "can be established with a 'reasonable degree
of certainty.'" *RSB Lab. Servs*, 368 N.J. Super. at 555-56 (App.
Div. 2004)(quoting *Pickett*, 131 N.J. at 474; *Stanley Co. of Am.
v. Hercules Powder Co.*, 16 N.J. 295, 314 (1954); *Desai v. Bd. of
Adjust. of Town of Phillipsburg*, 360 N.J. Super. 586, 595 (App.
Div. 2003), certif. denied, 177 N.J. 492 (2003); *V.A.L. Floors,
Inc. v. Westminster Cmtys., Inc.*, 355 N.J. Super. 416, 425 (App.
Div. 2002); *Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co.*,
226 N.J. Super. 200, 224 (App. Div.1988), *aff'd,* 118 N.J. 249
(1990)).  A claimant's inability to set damages precisely will
not preclude an award for future, "reasonably calculated" lost
profits.  *RSB Lab. Servs*, 368 N.J. Super. at 556.  Past
experience of an ongoing, successful business provides a
reasonable basis for the computation of lost profits "'with a
satisfactory degree of definiteness.'" *V.A.L. Floors, Inc.*, 355

N.J. Super. at 425 (quoting *Weiss v. Revenue Bldg. & Loan Ass'n*, 116 N.J.L. 208, 212 (E. & A. 1935)).

It should also be noted that as participants in a civil conspiracy, the Kavaleks and their corporations are all jointly liable for the underlying causes of action and resulting damages. *Banco Popular N. Am.*, 184 N.J. at 178.

Lost profits are the difference between the lost gross income and the costs or expenses which would have been expended to produce the income. *V.A.L. Floors*, 355 N.J. Super. at 422. Administrative expenses and overhead only are considered to be "costs or expenses" which are deductible from the lost gross income, if they are "reasonably allocable" to the lost sales in question. *Magnet Res., Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 294  (App. Div. 1998).

Damages in this case may also be measured by the amount of profits obtained by the Kavalek Defendants as a result of their breach.  Restatement (Second) of Agency  § 403 (1958) ("an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.") (cited by *Chernow v. Reyes*, 239 N.J. Super. 201, 205-06 (App. Div. 1990): *see also Cameco*, 157 N.J. at 518 ("If an employee "usurp[s] a corporate opportunity or secretly profit[s] from a competitive activity, the employer may recover the value of the lost

76

opportunity or the secret profit."). In essence, the agent holds benefits received in a constructive trust for the principal.

The Court finds that disgorgement of profits is the more appropriate method of calculating the damages caused by the Kavaleks, IGS and Geotech. This is because of the egregiousness of the Kavalek Defendants' conduct and the fact that their schemes were perpetrated fraudulently in clear violation of the fiduciary duties owed to their employer. The principles of agency, on which the remedy of disgorgement is based, are directly applicable here. Section 403 of the Restatement (Second) of Agency makes it clear that "an agent [who] receives anything as a result of his violation of a duty of loyalty to the principal, [...] is subject to a liability to deliver it, its value, or its proceeds, to the principal." Here, the Kavalek Defendants gained hundreds of thousands of dollars in profits as a direct result of the violation of their duties. To the extent that the disgorgement figure exceeds the lost profits calculation, the Kavalek Defendants should not be allowed to keep the difference, which was gained by their unlawful conduct. If the Kavaleks were allowed to keep the difference, this would essentially allow them to benefit simply because they were able to obtain a better profit margin. There is little question that the profit margins that they achieved owed a great debt to their

ability to use Vibra-Tech's confidential business information, its client lists and its equipment.

## B. Disgorgement of Profits

Plaintiff's accounting expert's measure of disgorgement damages due to the IGS scheme is reasonable.  It disgorges IGS net income and wages paid to Scott and Roberta Kavalek, less a reasonable wage for each of the individual defendants based on their actual wages received while at Vibra-Tech.  IGS's net taxable income through the end of 2009, $1,221,785, is added to Scott and Roberta Kavalek's IGS wages (less a reasonable salary for the work they provided to IGS), for a total of $1,419,765. Prejudgment interest through January 11, 2012, applied in accordance with New Jersey R. 4:42-11, totals $140,913, for a subtotal of $1,560,678.  Based on the IGS sales figures available, it is reasonable to assume that IGS net income for the first five months of 2010, the end of Scott Kavalek's two-year non-competition period, would have resulted in $115,985 in additional IGS net income. (Trial Trans. (J. Stavros) 1/23/2012, 94:25 - 97:12; P-12 at 2a, 6a).  After applying prejudgment interest on the projected net income during the first five months of 2010 in the amount of $355, total Vibra-Tech damages due to IGS under a disgorgement  measure of damages are $1,677,018. (Trial Trans. (J. Stavros) 1/23/2012, 94:25 - 97:12; P-12 at 2a, 6a).

78

Plaintiff's accounting expert's measure of disgorgement damages due to the Geotech scheme is reasonable.  It disgorges Geotech's net income from all sales, not just those made to Vibra-Tech, and wages paid to Scott and Roberta Kavalek, less a reasonable wage for each of the individual defendants, based on their actual wages received while at Vibra-Tech. The total of all Geotech net taxable income, including profits from sales to companies other than Vibra-Tech, less a reasonable wage for Scott and Roberta Kavalek is $239,827.  Prejudgment interest through January 11, 2012, applied in accordance with New Jersey R. 4:42-11, totals $27,567, for a subtotal of $267,394.  (Trial Trans. (J. Stavros) 1/23/2012, 48:6 - 71:5; P-12 at 3a).  After including the $16,962 for the fraudulent sale of tilt beams (*see supra* ¶ 116) plus pre-judgment interest, total Vibra-Tech damages due to Geotech under a disgorgement measure of damages is $284,356. (Trial Trans. (J. Stavros) 1/23/2012, 48:6 - 71:5, 74:7 - 74:20; P-12 at 3a).

## C.  Treble Damages and Attorneys' Fees

Under the New Jersey Consumer Fraud Act, the court "shall [...] award threefold the damages" suffered by a claimant as a result of the use of an unlawful practice under the Act. N.J.S.A. § 56:8-19.  The court "shall" also award the reasonable attorneys' fees, filing fees and costs of suit.  *Id.*

As discussed *supra*, Defendants Scott Kavalek, Roberta Kavalek and Geotech engaged in an unlawful practice under the New Jersey Consumer Fraud Act by failing to disclose to Vibra-Tech their relationship with Geotech and inducing Vibra-Tech to purchase equipment at a higher price than was necessary.  In addition, these Defendants further violated the Act when they induced Vibra-Tech to pay $15,375 in exchange for "new" tilt beams that Vibra-Tech already owned.

Vibra-Tech is therefore entitled to trebled damages under the Act for the ascertainable losses caused by their purchases from Geotech.  Vibra-Tech's total lost profits due to purchases made from Geotech is $149,331.  These damages will be trebled to $447,993.  To prevent a portion of the Geotech damages from being double-counted, in calculating the total amount of Vibra-Tech's damages due to the Geotech scheme, the Court must subtract the lost profits figure ($149,331) from the disgorgement figure ($284,356), which equals $135,025.  This amount ($135,025) is then added to the trebled damages ($447,993) to equal $583,018, the total amount of damages that Vibra-Tech is entitled to as a result of the Geotech scheme, inclusive of disgorgement and trebled damages, and pre-judgment interest.

Pursuant to the Act, Vibra-Tech shall also be awarded its reasonable attorneys' fees and costs of suit.  At this point, the Court has very little information on which to base a fee award.

Indeed, the Court notes that there appears to be a minimum of
amount of legal work that is directly attributable to the New
Jersey Consumer Fraud Act claim, which represents only a small
portion of this larger case.  Similarly, the Court is also unable
to identify any costs solely attributable to the claim under the
Act.  Therefore, the Court will grant Plaintiff 14 days from the
date of this Opinion to file an application for fees.

**D.  Punitive Damages**

   Vibra-Tech is entitled to punitive damages for its claims for
breach of fiduciary duty (Count One), tortious interference
(Counts Four, Five, and Twelve), conversion (Count Six), and
fraud (Count Nine).  Punitive damages are available under New
Jersey law and are governed by the Punitive Damages Act, N.J.
Stat. Ann. § 2A:15-5.09, et. seq (the "PDA").  To recover
punitive damages, the plaintiff must demonstrate

> by clear and convincing evidence, that the
> harm suffered was the result of the
> defendant's acts or omissions, and such acts
> or omissions were actuated by actual malice or
> accompanied by a wanton and willful disregard
> of persons who foreseeably might be harmed by
> those acts or omissions. This burden of proof
> may not be satisfied by proof of any degree of
> negligence including gross negligence.

*Id.* at 5.12(a).  The PDA defines actual malice as "an intentional
wrongdoing in the sense of an evil-minded act." *Id.* at 5.10.  It
defines "wanton and willful disregard" as a "deliberate act or
omission with knowledge of a high degree of probability of harm

81

to another and reckless indifference to the consequences of such act or omission." *Id.* Mere negligence is insufficient to prove a claim for punitive damages. *Pavlova v. Mint Mgmt. Corp.*, 375 N.J. Super. 397, 405 (App. Div. 2005).

The PDA also provides a list of types of evidence that the trier of fact must consider in determining whether punitive damages should be granted, including: "(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) The defendant's awareness or reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) The duration of the conduct or any concealment of it by the defendant." N.J.S.A. § 2A:15-5.12.

In the present case, the Kavalek Defendants were well aware of their duties to Vibra-Tech, the serious harm that they intended to cause to Vibra-Tech, and the harm they were in fact causing to Vibra-Tech. They knew the value of the many opportunities that they usurped from Vibra-Tech. They knew the amount of profits that they reaped as a reward for their unlawful acts.

Furthermore, they took great pains to conceal the existence and nature of their schemes from Vibra-Tech for an extended period of time, even after this suit was filed. Notably, as discussed *supra*, they knowingly and purposefully changed,

manipulated, tampered with and withheld evidence in order to bolster their legal and factual positions in this action.  Even after signing an adverse inference stipulation arising out of the Kavaleks' admitted evidence tampering, Roberta Kavalek attempted to disown the stipulation during trial by claiming that she did not intend to deceive the Court by editing the QuickBooks files.

The Kavalek Defendants' conduct was highly profitable to them and they have yet to terminate their conduct.  On the whole, Defendants have caused Vibra-Tech to suffer economic damages in the amount of $2,260,036.  The evidence in this case plainly weighs in favor of a significant punitive damages award. Therefore, the Court finds that an award of punitive damages in the amount of 50% of the economic damages award is appropriate. Thus, Vibra-Tech will be awarded a total of $1,130,018 in punitive damages.

### V. Conclusion

For the reasons stated above, the Court finds in favor of Plaintiff.  Judgment shall be entered in favor of Plaintiff and against Defendants Scott Kavalek, Roberta Kavalek, IGS, and Geotech as to Counts One, Four, Five, Six, Seven, Eight, and Nine of Plaintiff's Second Amended Complaint.  Judgment shall be entered in favor of Plaintiff and against Defendants Scott Kavalek, Roberta Kavalek, and IGS as to Count Twelve.  Judgment shall be entered in favor of Plaintiff and against Defendants

Scott Kavalek, Roberta Kavalek, and Geotech as to Count Thirteen. Judgment shall be entered in favor of Plaintiff and against Defendant Scott Kavalek as to Count Two.  Judgment shall be entered in favor of Plaintiff and against Defendant Roberta Kavalek as to Count Three.

Defendants Scott Kavalek, Roberta Kavalek, IGS, and Geotech will be jointly and severally liable for $2,260,036 in economic damages($1,677,018 in total IGS damages + $583,018 in total Geotech damages) and $1,130,018 in punitive damages, for a total amount of $3,390,054.

Plaintiff will have 14 days from the date of this Opinion to file an application for fees pursuant to the New Jersey Consumer Fraud Act claim.

An appropriate Judgment and Order accompany this Opinion.


Dated: March 29, 2012

                           s/Joseph E. Irenas
                        **JOSEPH E. IRENAS, S.U.S.D.J.**